[No. S043789. Oct. 5, 1995.]

GLENDA KRAFT DOAN, a Judge of the Municipal Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

302

COUNSEL

Kenneth B. Brock for Petitioner.

Daniel E. Lungren, Attorney General, J. Robert Jibson and Raymond L. Brosterhous II, Deputy Attorneys General, Behrens, Snyder & Romaine and William A. Romaine for Respondents.

OPINION

**THE COURT.**—These are formal judicial disciplinary proceedings under section 18 of article VI of the California Constitution. Under former subdivision (c) thereof, the Commission on Judicial Performance (hereafter sometimes the Commission) has recommended that we remove from office Glenda Kraft Doan, a judge of the municipal court, for certain misconduct that "occurr[ed] not more than 6 years prior to the commencement of [her] current term"—specifically, "wilful misconduct in office," "conduct prejudicial to the administration of justice that brings the judicial office into disrepute," and "persistent failure or inability to perform [her] duties."[1] Under rule 919(b) of the California Rules of Court, Doan has filed what we

---

[1] Under present subdivision (d) of section 18 of article VI of the California Constitution, as a general matter the Commission may now itself remove a judge from office and not merely recommend that we do so.

have deemed a petition for a writ of review, asking us to reject or modify the Commission's recommendation.[2]

## I. BACKGROUND

On January 27, 1994, after a preliminary investigation, the Commission filed a notice of formal proceedings against Doan. The notice recited that, between January 3, 1983, and June 29, 1992, Doan had been a judge of the Justice Court for the Corcoran Judicial District of Kings County, and that since June 29, 1992, she had been a judge of the Municipal Court for the Kings Judicial District of Kings County, Corcoran Division, into which the justice court had been consolidated. It went on to charge her in five counts with wilful misconduct, conduct prejudicial to the administration of justice, and persistent nonperformance of duties, as specified below.

*Count one* contained allegations to the following effect: in 1993, Doan and her husband, James Doan, owed about $400 to Miguel Meneses, their former gardener, for his services; in a felony action instituted against Meneses relating to conspiracy to possess cocaine for sale, Doan improperly engaged in ex parte contacts, including providing Meneses with legal advice; she failed to disclose her pertinent relationships and activities to the prosecution; she intentionally made a material misstatement of fact designed to mislead the prosecution as to the appropriateness of Meneses' release on his own recognizance; and, by failing to timely disqualify herself from, or at least disclose her pertinent relationships and activities at, a contested bail review hearing that resulted in her release of Meneses on his own recognizance, she failed to act with the impartiality expected of judicial office.

*Count two* contained allegations to the following effect: Doan engaged in a continuing pattern of failure to report income or loans in the statement of economic interests that she was required to file annually with the Fair Political Practices Commission pursuant to Government Code section 87200 et seq.; in 1989, she had been publicly reproved by the Commission for failing to report income in excess of $75,000; in 1990, she had been privately admonished by the Commission for failing to report loans obtained from Helen Cabell, a member of the court staff; in spite of the foregoing discipline, in 1991, she borrowed $3,000 from Russell Williams, a lieutenant in the Corcoran Police Department and its liaison with her court, insisted that there be no written evidence of the transaction, failed to report the loan,

---

[2]See *Geiler v. Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275, footnote 5 [110 Cal.Rptr. 201, 515 P.2d 1]: "[W]hen we receive a petition challenging the recommendation of the Commission, we deem it proper to treat it as a petition for a writ of review."

and had not yet made repayment; also in 1991, she borrowed about $10,410 from Hugh Osburn, who frequently appeared in her court for himself and for his business, Western Counties Insurance Brokers, failed to report the loan, and had not yet made repayment.

*Count three* contained allegations to the following effect: Doan improperly exploited her office by engaging in financial dealings with members of the court staff, including obtaining a loan of $740 from Cabell in 1993, purportedly for the benefit of one of her daughters; in addition, she involved herself in continuing business relationships with persons who appeared in her court: she obtained unpaid services, as evidenced by the debt of about $400 to Meneses; she also obtained loans—in 1991, she borrowed $3,000 from Lieutenant Williams and about $10,410 from Osburn; sometime before 1992, she borrowed about $10,000 from Morris Proctor; subsequently, she presided over a sentencing hearing involving Proctor's son; she did not disqualify herself or at least disclose her pertinent relationships and activities; she had not yet made repayment of the loan.

*Count four* contained allegations to the following effect: Doan failed to act in a manner that promotes confidence in the integrity of the judiciary; on June 29, 1993, she and her husband filed a voluntary petition of bankruptcy; they were required to list all creditors; in supporting declarations executed under penalty of perjury, she stated in substance that they had done so; her statement, however, was deliberately false, in that they had omitted, inter alios, Lieutenant Williams, Osburn, Proctor, and Fabrie Jewelers.

*Count five* contained allegations to the following effect: because she was habitually tardy in commencing court sessions, Doan persistently failed to perform her duties in a diligent fashion; her habitual tardiness adversely affected those who came into the courtroom and those who served on the court staff; and it continued despite repeated expressions of concern by the county administrative officer, the county court executive officer, another municipal court judge, and representatives of law enforcement agencies.

On March 8, 1994, Doan filed an answer. She denied the charges of wilful misconduct, conduct prejudicial to the administration of justice, and persistent nonperformance of duties.

On July 6, 1994, the Commission filed an amended notice of formal proceedings against Doan. The amended notice recited her judicial tenure as the original had done. It went on to charge her in seven counts with wilful misconduct, conduct prejudicial to the administration of justice, and persistent nonperformance of duties, as specified below.

*Count one* realleged Doan's acts and omissions, as stated in the same-numbered count of the original notice of formal proceedings, with regard to the Meneses matter. It also contained new allegations to the following effect: in 1992, she borrowed $4,500 for a term of one year without interest from Darlene Jones, who owned a restaurant in Corcoran, and had yet to make repayment except for about $750; subsequently, three events occurred, one involving Darren Powell, a nephew of Darlene, another involving Kenneth Jones, also a nephew, and yet another involving Darlene herself; *first*, Doan was assigned to preside over a misdemeanor action against Powell relating to resisting arrest and possessing an open container of an alcoholic beverage in a motor vehicle; she learned that Powell was Darlene's nephew; she commented to Darlene that she would "take care of the matter"; at a pretrial conference, she did not disqualify herself or advise any party of her comment to Darlene or her relationship with her as a friend and debtor; she was approached by the prosecutor and defense counsel with a proposal for a negotiated disposition, under which Powell would plead guilty to the resisting-arrest charge, with no jail time, and the People would move to dismiss the open-container charge; she rejected the proposal essentially as unfavorable to Powell; she continued the matter; later Judge Ronald J. Maciel, the judge of the Municipal Court for the Kings Judicial District of Kings County, Lemoore Division, accepted substantially the same proposal; *second*, she and Darlene were present at Darlene's restaurant one day when they saw Kenneth and a companion, Victoria Gamez, arrested for the misdemeanor of possession of an alcoholic beverage by a minor; Darlene expressed concern about the pair "getting into trouble" with the law; Doan assured her that she would "take care of the matter" and see to it that they would receive at most a sentence of community service, possibly involving an educational program at the California State Prison at Corcoran; she then presided over proceedings in misdemeanor actions against the pair; she subsequently dismissed the action against Gamez, and accepted a guilty plea from Kenneth and admitted him to probation on condition that he complete an educational program at the California State Prison at Corcoran; at no time did she advise the parties of her witnessing of the underlying incident, her relationship with Darlene, or her discussion with Darlene about the matter; *third*, she learned that a misdemeanor action had been brought against Darlene for obstructing an officer; she discussed the charge with Darlene; she advised her against retaining counsel because she had already spoken with Judge Maciel, who was assigned to the proceedings, and "the matter would be taken care of"; she did in fact speak with Judge Maciel about the case.

*Count two* realleged Doan's acts and omissions, as stated in the same-numbered count of the original notice of formal proceedings, with regard to

her continuing pattern of failure to report income or loans in her annual statement of economic interests, specifically the $3,000 loan from Lieutenant Williams and the $10,410 loan from Osburn, both obtained in 1991 and not yet repaid. It also contained new allegations to the following effect: beginning in 1991, she repeatedly borrowed money from Koma Howard, a resident of Corcoran, and routinely and periodically billed, for the education of the older of her two daughters, a line of credit that Howard had established for herself; by arrangement, she was required to repay Howard in the amount of $200 each month, and in the spring of 1994, had an outstanding balance of $4,107.64; in 1991, she borrowed $9,000 from Daisy Smith, a correctional officer assigned to the California State Prison at Corcoran, and had yet to make repayment; in 1992, she borrowed the sum of $4,500 from Darlene Jones, which she had yet to repay except for about $750, and from time to time in apparently the same period also borrowed small sums of $10 or $20 from her, which she had yet to repay.

*Count three* realleged Doan's acts and omissions, as stated in the same-numbered count of the original notice of formal proceedings, with regard to her financial dealings and business relationships with Meneses, Cabell, Lieutenant Williams, Osburn, and Proctor.

*Count four* realleged Doan's acts and omissions, as stated in the same-numbered count of the original notice of formal proceedings, with regard to her failure to list all creditors in her bankruptcy petition, omitting, inter alios, Lieutenant Williams, Osburn, Proctor, and Fabrie Jewelers. It also contained new allegations that she omitted Darlene Jones, Howard, and Smith as well.

*Count five* realleged Doan's acts and omissions, as stated in the same-numbered count of the original notice of formal proceedings, with regard to her persistent failure to perform her duties in a diligent fashion.

*Count six*, which was new to the amended notice of formal proceedings, contained allegations to the following effect: at some time after obtaining the $4,500 loan in 1992, Doan informed Darlene Jones that she could not make repayment but would instead "work off" the debt by providing her with legal assistance, specifically, by helping to prepare a petition for writ of habeas corpus on behalf of Darlene's husband, Rodney Jones, who had been convicted of federal felony narcotics trafficking offenses and was incarcerated in a federal correctional institution in Arizona; she indicated her intent not to sign the petition herself, but to have an attorney to do so, because it would be "illegal" for her to sign a pleading in such a matter; she asked for

and received legal papers and transcripts pertinent to Rodney's case; in the spring of 1993, she traveled with persons including Darlene to the federal correctional institution in Arizona, identified herself to the authorities there as a judge, and visited Rodney; she repeatedly stated that she would have Rodney "out of prison by Christmas" of 1993.

*Count seven*, which also was new to the amended notice of formal proceedings, contained allegations to the effect that, during the course of the Commission's preliminary investigation, Doan asked Darlene Jones and Howard, who were material witnesses, not to give their cooperation to its agents, specifically, not to discuss the $4,500 loan she had obtained from Darlene.

Doan did not file an answer to the amended notice of formal proceedings.

On June 14, 1994, at the Commission's request, we appointed three special masters to hear and take evidence in the matter and to report to the Commission. The evidentiary hearing was bifurcated. By the Commission's order under rule 907.2 of the California Rules of Court, it was open to the public on the first four counts of the amended notice of formal proceedings. Pursuant to rule 902(a) of those same rules, it was confidential on the last three.[3] The Commission appeared through its examiners. Doan, who was personally present, appeared through counsel.

On October 7, 1994, the special masters issued their report. Applying the standard of proof by clear and convincing evidence with the burden resting on the examiners, they made extensive, and largely unanimous, findings of fact and conclusions of law.[4] Their findings and conclusions were generally in accord with the allegations of the amended notice of formal proceedings,

---

[3]Under former subdivision (f)(3) of section 18 of article VI of the California Constitution, the Commission had authority to "open hearings to the public," "in the pursuit of public confidence and the interests of justice, . . . in the event charges involve moral turpitude, dishonesty, or corruption . . . ." On its view that former subdivision (f)(3) might authorize it to open a hearing only as to such charges, the Commission decided to bifurcate the evidentiary hearing in this matter. It determined that the first four counts of the amended notice of formal proceedings involved moral turpitude, dishonesty, or corruption, and hence might be heard in public. It determined that the last three counts either did not or might not, and hence should be heard in confidence. Subsequently, in *Adams* v. *Commission on Judicial Performance* (1994) 8 Cal.4th 630, 657-658 [34 Cal.Rptr.2d 641, 882 P.2d 358], we concluded that former subdivision (f)(3) authorized the Commission to open a hearing as to all charges if any one involved moral turpitude, dishonesty, or corruption. Under new subdivision (j) of section 18 of article VI, all hearings "shall be open to the public for all formal proceedings instituted after February 28, 1995."

[4]In this context, as generally, "findings of fact" include the resolution of both pure questions of fact and predominantly factual mixed questions of law and fact, and "conclusions

and as such were unfavorable to Doan. They included determinations that she engaged in conduct prejudicial to the administration of justice and persistently failed to perform her duties. One of the special masters would have determined that she committed wilful misconduct in the matters relating to Meneses and Darlene's nephew Darren Powell.[5]

On December 1, 1994, after the examiners and Doan had each filed a statement of objections to the special masters' report, the Commission conducted a hearing, which, like the evidentiary hearing, was open to the public as to the first four counts of the amended notice of formal proceedings and confidential as to the last three.[6] Pursuant to former subdivision (a) of section 8 of article VI of the California Constitution, the Commission then comprised nine members, a majority of whom were judges.[7] The examiners argued and responded to questions. Doan, who was personally present, appeared through counsel, who argued and responded to questions on her behalf.

On December 12, 1994, the Commission issued its decision. Applying the standard of proof by clear and convincing evidence as did the special masters, it made extensive, and largely unanimous, findings of fact and conclusions of law. As a general matter, its findings and conclusions, although more detailed, were substantially similar to the special masters'— except that they were even more in accord with the allegations of the amended notice of formal proceedings, and as such were even more unfavorable to Doan. They included determinations that she engaged in conduct prejudicial to the administration of justice and persistently failed to perform her duties. They also included determinations, like those of the dissenting special master, that she committed wilful misconduct in the matters relating to Meneses and Darlene's nephew Darren Powell.[8] The Commission dismissed the charges in Count Two as to the Osburn debt and the Smith loan, and in Count Three as to the Osburn debt, the Proctor loan, and the Meneses debt, having determined, apparently unanimously, that the underlying allegations had not been proved by clear and convincing evidence. On review of the entire record, it unanimously recommended that we remove Doan from

---

of law" include the resolution of both pure questions of law and predominantly legal mixed questions of law and fact.

[5]The special masters' findings of fact and conclusions of law are identified more fully in the course of the analysis that follows. (See, *post*, at pp. 311-338.)

[6]See footnote 3, *ante*.

[7]Pursuant to present subdivision (a) of section 8 of article VI of the California Constitution, the Commission now comprises 11 members, a majority of whom are not judges.

[8]The Commission's findings of fact and conclusions of law are set out in material part and with minor modifications in the course of the analysis that follows. (See, *post*, at pp. 311-338.)

office. Under former subdivision (a) of section 18 of article VI of the California Constitution, she became disqualified from acting as a judge, but without loss of salary, by reason of this recommendation, and has remained so during its pendency.[9]

On January 12, 1995, Doan filed the petition with which we are here concerned.

## II. The Law

Under former subdivision (c) of section 18 of article VI of the California Constitution, we may remove a judge from office only for certain specified kinds of misconduct: (1) "wilful misconduct in office"; (2) "conduct prejudicial to the administration of justice that brings the judicial office into disrepute"; (3) "persistent failure or inability to perform the judge's duties"; and (4) "habitual intemperance in the use of intoxicants or drugs."

Pertinent here are three of the four specified kinds of misconduct, to wit, wilful misconduct, conduct prejudicial to the administration of justice, and persistent nonperformance of duties.

Wilful misconduct was originally defined (*Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 795 [119 Cal.Rptr. 841, 532 P.2d 1209]) as "unjudicial conduct which a judge acting in his judicial capacity commits in bad faith" (*Geiler* v. *Commission on Judicial Qualifications, supra*, 10 Cal.3d at p. 284). It was subsequently elaborated through a gloss given to one of its phrases: "Bad faith" on the part of a judge entails *either* an intent, motivated by "actual malice," to commit an act that he knows or should know is beyond his lawful power *or* an intent to commit an act, even within his lawful power, "for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties." (*Spruance* v. *Commission on Judicial Qualifications, supra*, 13 Cal.3d at pp. 795-796; accord, *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 695 [122 Cal.Rptr. 778, 537 P.2d 898]; *Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 365 [188 Cal.Rptr. 880, 657 P.2d 372]; *Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 45-46 [207 Cal.Rptr. 171, 688 P.2d 551]; see *Gubler* v. *Commission on Judicial Performance, supra*, 37 Cal.3d at p. 46, fn. 7 [noting in substance that "bad faith" as an intent by a judge to commit an act that he knows or

---

[9]Under present subdivision (a) of section 18 of article VI of the California Constitution, a judge removed from office by the Commission (see fn. 1, *ante*) becomes disqualified from acting as such, but without loss of salary, by reason of a petition to review the Commission's determination.

should know is beyond his lawful power must be motivated by "actual malice"]; *Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1304-1305 [240 Cal.Rptr. 859, 743 P.2d 919] [to similar effect].)

■ Conduct prejudicial to the administration of justice has been defined as *either* "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office" (*Geiler* v. *Commission on Judicial Qualifications, supra*, 10 Cal.3d at p. 284) *or* "wilful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity" (*id.* at p. 284, fn. 11).

■ Persistent nonperformance of duties entails a pattern of legal or administrative omissions or inadequacies in the performance of a judge's duties. (See *McCullough* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 186, 191 [260 Cal.Rptr. 557, 776 P.2d 259].) It does *not* entail any intentional disregard of such duties. (See *Mardikian* v. *Commission on Judicial Performance* (1985) 40 Cal.3d 473, 482 [220 Cal.Rptr. 833, 709 P.2d 852].)

■ The question of misconduct obviously implicates the standard of conduct to which judges are held. That standard is manifested, in part, in the California Code of Judicial Conduct and its canons. (*Adams* v. *Commission on Judicial Performance, supra*, 8 Cal.4th at p. 661.) Adopted by California judges themselves,[10] the code does "not have the force of law or regulation . . . ." (*Adams* v. *Commission on Judicial Performance, supra*, 8 Cal.4th at p. 661.) Nevertheless, its canons "reflect a judicial consensus regarding appropriate behavior, and are helpful in giving content to" former subdivision (c) of section 18 of article VI of the California Constitution. (*Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 838, fn. 6 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235] accord, *Adams* v. *Commission on Judicial Performance, supra*, 8 Cal.4th at pp. 661-662.)

■ In determining the ultimate issue whether to remove a judge from office for misconduct under former subdivision (c) of section 18 of article VI of the California Constitution, we proceed independently. (See *Spruance* v. *Commission on Judicial Qualifications, supra*, 13 Cal.3d at p. 799, fn. 18.) It

---

[10]"The California Code of Judicial Conduct, adapted from the American Bar Association Code of Judicial Conduct of 1972, was adopted by the . . . Conference of [California] Judges (later renamed the California Judges Association) on September 10, 1974, effective January [1], 1975. [On October 5, 1992,] the California Judges Association adopted a revised California Code of Judicial Conduct." (*Adams* v. *Commission on Judicial Performance, supra*, 8 Cal.4th at p. 637, fn. 2.)

is true that the Commission has the power to make a recommendation of removal. (Cal. Const., art. VI, § 18, former subd. (c), as amended by initiative Gen. Elec. (Nov. 8, 1988) see, e.g., *Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at p. 275.) It is also true that its making of such a recommendation is a prerequisite to a subsequent order to that effect on our part. (E.g., *Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at p. 276; see Cal. Const., art. VI, § 18, former subd. (c), as amended by initiative, Gen. Elec. (Nov. 8, 1988).) But it is we who remove, not the Commission. (Cal. Const., art. VI, § 18, former subd. (c), as amended by initiative, Gen. Elec. (Nov. 8, 1988); see, e.g., *Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at p. 276.) This does not mean that we ignore its views. We do not. Rather, in recognition of its "expertise . . . in matters involving judicial conduct," we give "special weight" to its recommendation. (*Kloepfer* v. *Commission on Judicial Performance*, *supra*, 49 Cal.3d at p. 832.)

In determining the issues that underlie the removal of a judge from office under former subdivision (c) of section 18 of article VI of the California Constitution, we also proceed independently. (See *Spruance* v. *Commission on Judicial Qualifications*, *supra*, 13 Cal.3d at p. 799, fn. 18.) As stated, we may remove a judge only for certain specified kinds of misconduct. We may find such misconduct only if it is proved by clear and convincing evidence, with the burden resting on the examiners for the Commission. (E.g., *Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at p. 275; see, e.g., *Spruance* v. *Commission on Judicial Qualifications*, *supra*, 13 Cal.3d at pp. 784-785.)[11] In this regard, we ourselves make findings of fact and conclusions of law. (E.g., *Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at p. 276; *Cannon* v. *Commission on Judicial Qualifications*, *supra*, 14 Cal.3d at p. 685.) But we do not do so, as it were, in a vacuum. Applying the indicated standard of proof (see *Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at pp. 276-277), special masters initially make findings and conclusions (see *id.* at p. 275). Applying the same standard (*ibid.*), the Commission, in turn, makes findings and conclusions of its own, unaffected by those of the special masters (*ibid.*). Generally, we give "weight" to both the findings and conclusions of both the special masters and the Commission. (E.g., *Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 622 [175 Cal.Rptr. 420, 630 P.2d 954].) When they vary, we favor the conclusions of the Commission over

---

[11]The misconduct in question, of course, must first be charged. (See *Kennick* v. *Commission on Judicial Performance* (1990) 50 Cal.3d 297, 315 [267 Cal.Rptr. 293, 787 P.2d 591]; see also *Gonzalez* v. *Commission on Judicial Performance*, *supra*, 33 Cal.3d at p. 365 [holding that it is "the allegations" that must be proved by clear and convincing evidence]; *Roberts* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 739, 746 [190 Cal.Rptr. 910, 661 P.2d 1064] [to similar effect].)

those of the special masters "because of its expertise in matters of judicial conduct" (*McCullough* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 191; accord, e.g., *Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866, 880 [42 Cal.Rptr.2d 606, 897 P.2d 544]; *Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 832), whereas we favor the findings of the special masters over those of the Commission "because of [their] ability to evaluate the credibility of . . . witnesses" (*McCullough* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 191; see, e.g., *Adams* v. *Commission on Judicial Performance, supra,* 10 Cal.4th at p. 880; *Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d at p. 1304).[12]

Finally, in deciding whether to impose discipline under former subdivision (c) of section 18 of article VI of the California Constitution and, if so, what form such discipline should take, we seek as our "ultimate objective . . . to protect the judicial system and the public which it serves from judges who are unfit to hold office." (*McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1, 9 [138 Cal.Rptr. 459, 564 P.2d 1]; accord, *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d at p. 654; *Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d at p. 1320; see *Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at pp. 864-865 [stating that the "purpose of Commission proceedings is . . . protection of the public, ensuring evenhanded and efficient administration of justice, and the maintenance of public confidence in the integrity of the judicial system"]; *Adams* v. *Commission on Judicial Performance, supra,* 10 Cal.4th at p. 912 [to similar effect].) The answer depends on what sanction, if any, is necessary to achieve this goal. (*Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 865.)

## III. ANALYSIS

The issue that we must resolve is, of course, whether Doan has in fact subjected herself to discipline by her conduct and, if so, what discipline she requires.

---

[12]Although we proceed independently in determining the underlying issues bearing on the removal of a judge from office under former subdivision (c) of section 18 of article VI of the California Constitution, we are limited in the following regard: we may not find misconduct as to a charge that the Commission has dismissed either because the facts alleged were not proved by clear and convincing evidence or because the facts alleged, even if so proved, did not amount to misconduct under the law. (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d at pp. 784-785, fn. 5; see, e.g., *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d at p. 622.)

## A. *Prior Discipline*

The following three matters were established before the special masters and accepted by the Commission.

In 1989, the Commission publicly reproved Doan for conduct prejudicial to the administration of justice. It stated to the effect that, since January 3, 1983, she had served as a judge of the Justice Court for the Corcoran Judicial District of Kings County; as she was then permitted, she continued to practice law; through 1986, she received from a client payments totaling more than $75,000, which were not given for legal services; she variously described the payments as gifts, loans, and income; before receiving the payments, she did not comply with former rule 5-101 of the Rules of Professional Conduct of the State Bar of California, relating to the avoidance of interests adverse to a client; she did not inform her law firm about the payments; she failed to disclose the payments, as required, in her annual statement of economic interests; because she engaged in the conduct in question off the bench, did not compromise her performance as a judge so far as the evidence disclosed, expressed great remorse, and had a long record of civic service, she was sanctioned only with public reproval.

In 1990, the Commission privately admonished Doan for "improper action[s]" within the meaning of former subdivision (c) of section 18 of article VI of the California Constitution. It stated to the effect that, on at least two occasions, she prevailed on a member of the court staff—stipulated at the evidentiary hearing to be Helen Cabell—to lend her several thousand dollars; although she eventually repaid the loans, she violated former canon 5C(1) of the California Code of Judicial Conduct, which counseled judges, inter alia, to refrain from financial and business dealings that exploit their judicial position; further, she failed to disclose the loans, as required, in her annual statement of economic interests, but appeared to have done so out of negligence and not wilfully.

Also in 1990, the Commission publicly reproved Doan apparently for conduct prejudicial to the administration of justice. It stated to the effect that, in 1988, she was approached in private by an acquaintance and was asked to help obtain the release of a relative who had just been arrested for serious crimes of violence and who was within the exclusive jurisdiction of the superior court because he was under the age of 18; she then telephoned a superior court judge at home, told him she knew the youth's family and considered them "good people," and asked him to release the youth under supervision but without bail; he declined, stating that the request was

improper; at a hearing the next day, he disclosed the telephone conversation; she also telephoned a deputy probation officer and requested him to recommend the youth's release pending the hearing; he refused; a day or two later, she encountered him in court and repeated her request; he again refused; in acting as she did, she violated former canon 2B of the California Code of Judicial Conduct, which counseled judges, inter alia, not to lend the prestige of their office to advance the private interest of others; subsequently, in response to a request by the Commission for comment on the matter, she falsely stated that she had not attempted to help gain release for the youth; because she ultimately recognized that she had acted inappropriately and promised that she would not do so again, she was sanctioned only with public reproval.

### B. *The Present Charges*

The question before us here is whether any of the charges against Doan for wilful misconduct, conduct prejudicial to the administration of justice, and persistent nonperformance of duties that were set up in the amended notice of formal proceedings and that survived dismissal by the Commission have been proved by clear and convincing evidence. In giving our answer, we shall proceed count by count.

### 1. *Count One*

Count one has four parts, concerning the matters in which Doan involved herself relating to Miguel Meneses, Darlene Jones's nephew Darren Powell, Darlene's nephew Kenneth Jones, and Darlene herself.

### a. *The Meneses Matter*

 The Commission's findings of fact and conclusions of law are set out in material part and with minor modifications below. They are unanimous and, although more detailed, substantially similar to those of the special masters, except as noted.

On March 6, 1993, the Commission's findings begin, Miguel Meneses conducted Miguel's Gardening Service together with his wife, Lydia Meneses. Doan and her husband, James Doan, had been customers. Meneses had dealt primarily with James. Meneses had terminated service to the Doans in 1988. At that time, he was owed $400. He did not take any legal action to collect. On the date in question, he was arrested, in a "reverse sting operation," as a suspected member of a conspiracy to possess cocaine for sale, and was booked into the Corcoran Police Department jail. Sergeant David Frost

of the Corcoran Police Department, who was in charge of the narcotics unit, was the supervising officer. Ray Garcia of the same department was the investigating officer. At 7:15 that evening, Doan signed a document entitled "Probable Cause for Warrantless Arrest" as to Meneses for participation in the conspiracy, setting bail according to a schedule.

On the morning of March 7, 1993, which was a Sunday, the Commission's findings continue, Lydia Meneses went to Doan's home, bringing her children. She had received a telephone call from Meneses, who said he was in jail and did not know why; she became distraught. Having little knowledge of legal matters, she went to seek advice and a referral to an attorney. Lydia and Doan were mere acquaintances, not friends. Lydia did not ask Doan to help get Meneses out of jail, and did not ask her about bail proceedings. Doan became concerned about Lydia and her situation. She attempted to reach Officer Garcia at the Corcoran Police Department, but was unsuccessful because he was off duty, and left a request that he call her at home. Receiving the request from the department at 9 a.m., he did so. In the ensuing conversation, she said that Meneses was her gardener, had been around her home, and had earned her trust, and that Lydia was one of her friends; using Meneses' given name, she asked why "Miguel" had been arrested and whether he was surely involved in the underlying transaction; he responded, adding that, on his arrest, Meneses was found in possession of a marked $100 bill that had earlier been used by an undercover agent in making a purchase; three times, she asked his opinion about a release for Meneses on his own recognizance; each time, it appears, he responded that, since the decision belonged to the court, he would take no position, either in support of or in opposition to such a release; he did not say that he gave his consent. She had asked his opinion on criminal matters in the past, although never before had she contacted him when he was off duty. He had expressed his opinion to her in the past, including his objection to a release, and was not afraid to do so. Through Sergeant Manuel Gonzales, she made arrangements for a visit with Meneses in jail—an act that had been uncommon for her in the past. She asked Gonzales whether he thought Meneses was guilty, and told him that she would subsequently disqualify herself from the case. At the jail, Lydia and Meneses met for about 15 minutes in the presence of Gonzales alone. Near the end of the time, Doan came by and informed Lydia she intended to leave. Lydia spoke both English and Spanish, Meneses only Spanish, and Doan only English. Doan told Lydia to advise Meneses that he needed the services of an attorney and that he should not make any statement until he had obtained such services.

On the morning of March 8, 1993, the Commission's findings go on, Sergeant Frost went to Doan's chambers, having heard from Officer Garcia

that she might release Meneses on his own recognizance. He stated that he was opposed to such a release. He explained: Meneses was involved with large quantities of cocaine, in the range of one to three kilograms; he had recently made hand-to-hand sales; on his arrest, he was found in possession of the marked $100 bill that had earlier been used by an undercover agent in making a purchase; he was reportedly conducting transactions with youngsters and young adults in the Corcoran area; and his residence had been subject to a search warrant based on his sales activity. Frost also stated that he knew of the business relationship between Meneses and the Doans, and believed that it "would be a problem." She said she had not had any indication that Meneses was involved in such matters.

On March 9, 1993, the Commission's findings continue, Meneses was arraigned, and counsel appointed, in the Municipal Court for the Kings Judicial District of Kings County, Hanford Division, by Judge John G. O'Rourke. Bail was set at $100,000. A bail review hearing was set for March 11 in the same court.

On March 11, 1993, the Commission's findings go on, Doan presided over Meneses' bail review hearing. By this time, she had developed a strong personal interest in Meneses' case, largely because she wanted to help Lydia. At the hearing, she made no disclosure. Moreover, she represented that Officer Garcia did not oppose an own-recognizance release for Meneses—an intentional omission of material fact, inasmuch as Garcia also did not support such a release. Deputy District Attorney Michael Casaus requested a bench conference because he believed that Meneses must have been a confidential informant. At the bench, Doan further represented that Garcia was closer to supporting an own-recognizance release than merely not opposing such a release—an intentional misstatement of material fact. She did not mention Sergeant Frost's opposition—another intentional omission of material fact. She proceeded to release Meneses on his own recognizance subject to certain terms and conditions. Casaus considered her representations at the hearing so unusual that he later inquired of his supervisor whether Meneses was in fact a confidential informant. Within a day, Meneses was returned to custody on an unrelated Tulare County arrest warrant.

In acting and failing to act as she did, concluded the Commission unanimously and one of the special masters, Doan committed wilful misconduct. Her cited acts and omissions included: ex parte contacts with Lydia, Meneses, Officer Garcia, and Sergeant Frost; personal involvement in the case as an advocate for Meneses in violation of former canon 2B of the California

Code of Judicial Conduct, which counseled judges, inter alia, not to allow their family, social, or other relationships to influence their judicial conduct or judgment; initiation of an "investigation" as to the propriety of an own-recognizance release for Meneses by contacting Officer Garcia; questioning Officer Garcia and Sergeant Gonzales as to whether they believed Meneses was guilty; failure to disqualify herself or at least to disclose her pertinent relationships and activities, in spite of her implicit recognition that such action was necessary; and manipulation of the bail review hearing through intentional misstatements and omissions of material fact in order to achieve her desired result, which was an own-recognizance release for Meneses. According to the conclusion of two of the special masters, however, she engaged only in conduct prejudicial to the administration of justice.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. In effect, Doan does not challenge the facts themselves. Rather, she attempts to dispute the inferences that the facts support. She would have us view her acts and omissions as praiseworthy or at least not such as would subject her to discipline. The record prohibits us from doing so.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. Doan argues that, at most, she engaged in conduct prejudicial to the administration of justice, as two of the special masters had concluded, and did not commit wilful misconduct. Her argument, like the two special masters' conclusion, rests on the premise that the "bad faith" (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 284) required for wilful misconduct does not encompass an intent by a judge to commit an act "for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties" (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d at p. 796), *if such act is within his lawful power.* We recognize that some language in some opinions might perhaps be read to support that premise. (See *Wenger* v. *Commission on Judicial Performance,* 29 Cal.3d at p. 622, fn. 4; *Ryan* v. *Commission on Judicial Performance* (1988) 45 Cal.3d 518, 531 [247 Cal.Rptr. 378, 754 P.2d 724, 76 A.L.R.4th 951]; *McCullough* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 191; *Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 832; *Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at pp. 313-314; *Adams* v. *Commission on Judicial Performance, supra,* 10 Cal.4th at pp. 877-878.) A reading of this sort, however, should not be indulged. For it would yield untenable results, such as a conclusion that "bad faith"

could not characterize the mental state of a judge who rendered judgment in exchange for a bribe on the ground that the rendering of judgment was within his lawful power.

■ Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed wilful misconduct in the Meneses matter.

### b. *The Powell Matter*

■ The Commission's findings of fact and conclusions of law are set out in material part and with minor modifications below. Except as noted, they are unanimous and, although more detailed, substantially similar to those of the special masters.

Doan and her husband James, the Commission's findings begin by way of introduction, had a trucking business. In 1989, it began to fail. In the summer of 1992, creditors started to attach the couple's business and personal bank accounts. The Doans' efforts to turn the business around would fail, and they would file a voluntary petition of bankruptcy on June 29, 1993. To return to the summer of 1992: Doan's best friend was Koma Howard and one of her closest friends was Darlene Jones. The three women frequently walked and talked together in the evenings. They saw each other daily. Darlene was a frequent guest in Doan's chambers. Darlene owned and operated a restaurant in Corcoran called Roy's Drive-In. Her husband, Rodney Jones, had been convicted of federal felony narcotics trafficking offenses and was imprisoned at the Federal Correctional Institute in Phoenix, Arizona. On August 11, 1992, Darlene lent Doan $4,500, interest free, at her urgent request, on an oral agreement that she would repay the loan within a year. Doan asked for cash, stating that her bank account had been attached and that she would lose her office if outstanding checks were returned unpaid. Darlene complied, purchasing a cashier's check in the amount indicated. She made the loan to Doan personally and not to the trucking business. Darlene explained that she had set aside the money for Rodney's legal fees. Through the fall of 1993, Doan frequently told Darlene, Howard, and Kathy Jones, who was Darlene's sister-in-law, that she was working on Rodney's case. She said that she was conducting legal research, which included reviewing trial transcripts and briefs. She also said that Rodney would be home by Christmas of 1993. As a consequence, Darlene lent her additional money, provided free meals to her and to her family and friends, allowed her to take food from the restaurant when she was not present, and drove her to and from court. Doan asked whether she would have to repay

the loan if she got Rodney home by December of 1993; Darlene said she would not. In the spring of 1993, Doan went with Darlene and Rodney's brother, Jimmy Jones, to visit Rodney in prison. She told Darlene that she would give the results of her legal research to an attorney who would represent Rodney, and that she would thereby reduce the amount of attorney fees she would have to pay. She recommended, among other attorneys, William Logan, who had appeared in her courtroom several times over the years. She then accompanied Darlene to Logan's office. There, Darlene retained Logan to represent Rodney. Afterward, Logan spoke with Doan several times on the telephone about the matter. At appearances in her courtroom, he received documents concerning the case, which Doan had been given by Darlene. At two meetings in Logan's office, Doan explained to Darlene in lay terms some of the legal matters under discussion. On other occasions, she told Darlene and Howard that she could no longer hold judicial office and practice law at the same time, and stated that she would not sign any pleading or other document. As it turned out, Rodney was not released by Christmas of 1993. At the time of the evidentiary hearing in mid-1994, Doan had repaid only a portion of the loan she had obtained from Darlene. It was not proved by clear and convincing evidence that she did not conduct the legal research in question. (It *was* so proved, according to the special masters.)

On July 11, 1992, the Commission's findings continue, Darren Powell was arrested by officers of the Corcoran Police Department for resisting arrest and possessing an open container of an alcoholic beverage in a motor vehicle. Powell was Darlene's nephew. Doan knew that he was. After review, Deputy District Attorney Gayle Helart charged Powell with resisting arrest and possessing the open container. Doan spoke to Darlene in Howard's presence about the case on several occasions during its pendency. Each time, she made substantially the same statement: she would take care of the matter and Darlene should not worry. Before a pretrial conference set for October 5, 1992, Helart and Marianne Brock, who was Powell's attorney, reached an agreement on a negotiated disposition with Powell's concurrence: Powell would plead guilty to the resisting-arrest charge, and the People would move to dismiss the open-container charge and would recommend a fine and no jail time. Doan presided at the conference. Brock sought to determine whether Doan was inclined to impose any jail time, which might disrupt the agreement. Doan then stated, inter alia, that she did not believe that Powell should plead guilty to the resisting-arrest charge at all because, she asserted, he would then have that conviction on his record permanently; Brock had a good chance of obtaining a not guilty verdict from a jury because one of the arresting officers was not well liked in the community

and because there might be a viable defense of voluntary intoxication; Brock should notice a motion to suppress; and Helart was an inexperienced prosecutor and had apparently overcharged. She spoke directly to Powell: he would be making a mistake by pleading guilty to the resisting-arrest charge, and should consider pleading not guilty; Helart would further review the matter and might reduce the charge to disturbing the peace. Helart protested that Doan should not have made the latter statement because it was not true. Brock said that Powell wished to plead guilty to the resisting-arrest charge that day. Thereupon, Doan called Helart and Brock into chambers. She continued to attempt to persuade Helart to reduce the charge to disturbing the peace. Helart stood firm. Then, at Brock's request, she continued the matter. At no time did she disclose her relationship to Darlene or her discussions with her about the case. Brock subsequently noticed a suppression motion but then, finding no merit, declined to proceed. At Helart's request, Doan eventually disqualified herself. On April 27, 1993, Judge Ronald J. Maciel of the Municipal Court for the Kings Judicial District of Kings County, Lemoore Division, to whom the matter had been reassigned, accepted substantially the same plea agreement that Helart and Brock had originally reached with Powell's concurrence.

In acting and failing to act as she did, concluded eight members of the Commission and one of the special masters, Doan committed wilful misconduct. Her cited acts and omissions included: failure to disqualify herself or to disclose her relationship to Darlene or her discussions with her about the case; and use of the authority of her judicial office to attempt to influence the outcome of Powell's pretrial conference by exerting pressure on Deputy District Attorney Helart to reduce the charge of resisting arrest to disturbing the peace, for the corrupt purpose of further ingratiating herself with Darlene in order to advance their relationship. According to the conclusion of one member of the Commission and two of the special masters, however, she engaged only in conduct prejudicial to the administration of justice.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan challenges the facts. At the evidentiary hearing, the witnesses included Darlene, Howard, Deputy District Attorney Helart, Attorney Brock, Judge Maciel, and Doan herself. The testimony of Doan was favorable to her position. That of the others, especially Darlene, Howard, and Helart, was not. Calling herself "blameless," and suggesting that Darlene, Howard, and Helart are not, Doan asks us to generally accept her testimony and reject theirs on credibility grounds. The special masters, who saw the witnesses and heard their words, believed Darlene, Howard,

and Helart and disbelieved Doan. After reviewing the record, the Commission did so as well. So now do we.

We also believe that the Commission's conclusions as stated above are substantially sound, and adopt them as our own. Doan argues, as noted, that she was "blameless." Under the facts found, she was not. She asserts that the appropriate charge in the Powell matter was, in fact, disturbing the peace and not resisting arrest. In support, she relies on testimony by Judge Maciel to the same effect. What is dispositive, however, is not the correctness of her legal opinion but the impropriety of her surrounding behavior. We recognize that one of the members of the Commission and two of the special masters concluded that she engaged only in conduct prejudicial to the administration of justice and did not commit wilful misconduct. Their conclusion—evidently for the special masters and apparently for the Commission member— rests on the erroneous premise that the "bad faith" (*Geiler* v. *Commission on Judicial Qualifications*, *supra*, 10 Cal.3d at p. 284) required for wilful misconduct does not encompass an intent by a judge to commit an act "for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties" (*Spruance* v. *Commission on Judicial Qualifications*, *supra*, 13 Cal.3d at p. 796), if such act is within his lawful power.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed wilful misconduct in the Powell matter.

### c. *The Kenneth Jones Matter*

Set out below in material part and with minor modifications are the Commission's findings of fact and conclusions of law, which are unanimous and, although more detailed, substantially similar to those of the special masters.

On August 22, 1992, according to the Commission's findings, Kenneth Jones, then 20 years old, and a companion, Victoria Gamez, then 18 years old, were detained across the street from Darlene Jones's restaurant and cited by Kings County deputy sheriffs as minors in possession of alcohol. Although not a witness to the incident, Doan was present at the restaurant with Darlene and Howard at the time it transpired. Kenneth was Darlene's nephew. Doan knew that he was. Howard went to ask the couple what had happened and came back to tell Doan and Darlene. In response to concerns expressed by Darlene, Doan said, "It isn't anything serious, do not worry about it. I will put him through a program that will keep it off his record." By these words, she was referring to the "Rock Program," which she had

helped develop to provide youthful offenders with a "shock experience" at the California State Prison at Corcoran. She customarily gave minors charged with possession of alcohol the opportunity to attend this program. On September 28, 1992, she presided at a pretrial conference for Kenneth: she offered him an opportunity to attend the program, and he accepted. At no time did she disclose her relationship to Darlene or her discussions with her about the case. It does not appear, however, that the relationship or the discussions affected the disposition. Her words quoted above could be viewed as a statement of fact about her standard and indeed invariable practice in such cases. That same day, she also presided at a pretrial conference for Gamez: she dismissed the action.

In acting and failing to act as she did, concluded the Commission, Doan committed conduct prejudicial to the administration of justice. Her cited acts and omissions included the failure to disqualify herself or at least to disclose her relationship to Darlene or her discussions with her about the case—an omission that gave rise to the appearance of impropriety.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan does not challenge the facts. If she had, she would not have been successful. The record would defeat any such attempt.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. Doan denies impropriety. She refers to one of the requirements of conduct prejudicial to the administration of justice, viz., that an "objective observer" must view the conduct in question to be such. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 284.) She then argues that an "objective observer," if he had knowledge of the community of Corcoran and its residents, would not view her acts and omissions thus. Let us assume for argument's sake that an "objective observer" must be deemed knowledgeable about Corcoran. The result is not favorable to Doan. Because the community of Corcoran is small and its residents few, an "objective observer" might not view as prejudicial to the administration of justice the fact that Doan had a relationship with Darlene or even engaged in discussions with her about the case. But he would see matters differently as to her failure to at least disclose the relationship and the discussions. She appears to claim that, in light of the fact that she was reelected to office in June of 1994, "actual observers" among the voters did not view her acts and omissions as prejudicial to the administration of justice. We are concerned with an "objective observer" and not with the "actual observers." Furthermore,

"actual observers" among the voters apparently had only limited knowledge of her improprieties; certainly, the formal proceedings against her remained confidential until after the election. ▮ ▮ To be sure, it is *sufficient* that the "actual observers" view the conduct in question to be such. (See *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 534 [116 Cal.Rptr. 260, 526 P.2d 268].) But, contrary to her assertion, it is not *necessary*. ▮ We recognize that in *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, it is stated: "Prejudicial conduct must be 'conduct prejudicial to the administration of justice *that brings the judicial office into disrepute.*' ([Cal.] Const., art. VI, § 18, [former] subd. (c); italics added.) The italicized words do not require notoriety, but only that the conduct be 'damaging to the esteem for the judiciary held by members of the public who observed such conduct.' (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 534 [116 Cal.Rptr. 260, 526 P.2d 268].)" (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d at pp. 622-623, fn. 4; accord, *Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 314; *Gubler* v. *Commission on Judicial Performance, supra,* 37 Cal.3d at p. 46; *Roberts* v. *Commission on Judicial Performance, supra,* 33 Cal.3d at p. 748.) To the extent that the quoted language suggests that it is necessary that the "actual observers" view the conduct in question to be prejudicial to the administration of justice, it is mere dictum, finds no support in the quoted decision, is unsound, and is hereby disapproved.

▮ Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the Kenneth Jones matter.

### d. *The Darlene Jones Matter*

▮ The Commission's findings of fact and conclusions of law are set out in material part and with minor modifications below. Although more detailed, they are substantially similar to those of the special masters and, except as noted, are also unanimous.

On May 6, 1993, according to the Commission's findings, Darlene Jones was cited for obstructing a public officer in the performance of his duties as he was executing a creditor's "till tap" at her restaurant. She was subsequently charged with the underlying offense. On June 9, 1993, at the time set for arraignment, Doan disqualified herself. Judge Maciel was assigned to the matter. More than once while the charges were pending, in the presence of Koma Howard and Kathy Jones, Doan made statements to Darlene such as the following: "Do not worry, I will take care of it." "Everything will be

okay." "You do not need an attorney, do not waste your money on it." "I will talk to Judge Maciel about it." "I have talked to Judge Maciel about it and everything has been taken care of. Nothing is going to happen." "We do it all the time. I can do him a favor and he can do me a favor, judges do that." Doan did in fact speak with Judge Maciel: she told him that she had disqualified herself and, on his inquiry, that the case involved obstructing a public officer as he was executing a creditor's "till tap" and had arisen out of a "mess up" by attorneys in an underlying civil action. She did not, however, request any favors or preferential treatment for Darlene. Darlene eventually retained counsel. On August 23, 1993, at a pretrial conference presided over by Judge Maciel, she entered a plea of guilty to a reduced charge of disturbing the peace, and was ordered booked and released, placed on probation for one year, and fined $145. At all times pertinent here, Darlene was providing small loans and meals to Doan and her family. Doan wanted to continue to obtain money and food from Darlene—hence, her efforts to give the impression that she was assisting in the case.

In acting and failing to act as she did, concluded eight members of the Commission and all three of the special masters, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts and omissions included: the giving of assurances to Darlene as to the outcome of the prosecution against her, with an implication of inside information and influence; and an apparent intent to mislead Darlene in order to continue to obtain money and food. According to the conclusion of one member of the Commission, however, she committed wilful misconduct.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan challenges the facts. As noted, at the evidentiary hearing, the witnesses included Darlene, Howard, Kathy Jones, and Doan herself. The testimony of Doan was favorable to her position; that of Darlene, Howard, and Kathy Jones was not. Against the Commission and, more notably, the special masters, Doan asks us to generally believe her and disbelieve the others. We will not.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. As a major premise, Doan argues that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such. As a minor premise, she asserts that Darlene, the primary "actual observer," could not have so viewed her acts and omissions because of what she deems to be Darlene's bad character. We need not detain ourselves with the minor

premise. We must simply reject the major premise out of hand. As explained, the "requirement" that she claims to discern is nonexistent. She states that any assurances she may have given to Darlene as to the outcome of the prosecution against her proved ineffective in view of the fact that she eventually paid no heed to her words but chose to retain counsel. She fails to show, and we fail to see, the relevance of her assertion.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the Darlene Jones matter.

### 2. *Count Two*

As pertinent here, count two has three parts, concerning Doan's failure to report in her annual statement of economic interests loans she had obtained from Lieutenant Russell Williams, Koma Howard, and Darlene Jones.

#### a. *The Williams Loan*

The Commission's findings of fact and conclusions of law are set out in material part and with minor modifications below. Although more detailed, they are substantially similar to those of the special masters and, except as noted, are also unanimous.

Like other public officials—the Commission's findings begin by way of introduction—Doan was required to file a statement of economic interests annually with the Fair Political Practices Commission pursuant to Government Code section 87200 et seq. She was under an obligation to disclose, among other things, all loans of $250 or more made to her or her husband and all loans of $10,000 or more made to any business in which she had an interest of at least 10 percent. She was not under an obligation to disclose, among other things, loans from certain close family members or retail installment or credit card transactions under $10,000 if the account was maintained in the creditor's regular course of business.

On April 23, 1991, the Commission's findings continue, Russell Williams lent Doan $3,000, interest free, to be repaid within six months. The two had known each other for many years, and lived only four houses from each other. He was a lieutenant in the Corcoran Police Department. At that time, he served as the department's court liaison officer. In such capacity, he routinely presented Doan with complaints and warrant applications; she did not supervise him and he had no particular stake in her decisions. On the

date in question, she went to his office. She requested a loan with no written evidence of the transaction. She was distraught, explaining that the trucking business was causing severe financial problems. He complied with her request. He made the loan to her personally, and not to the trucking business; he did so out of friendship, and not because of her position. He retired later that year. She did not make repayment within six months. On June 6, 1994, she gave him a check drawn by her husband in the amount of $1,500. The evidence does not disclose whether this instrument was drawn on a personal or business account. She did not disclose the loan in her statement of economic interests for 1991 or 1992, but did so for 1993. At the evidentiary hearing, she testified that she failed to make the disclosure because she had forgotten to do so. She also testified that she resented the requirement of filing such a statement and considered it an invasion of privacy.

In acting and failing to act as she did, concluded six members of the Commission and all three of the special masters, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts and omissions included the violation of an obligation imposed on her as a public official by statute, which must be viewed as flagrant and deliberate in light of the fact that she had been publicly reproved for similar acts and omissions in 1989. According to the conclusion of three members of the Commission, however, she committed wilful misconduct.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan does not, and cannot, challenge the facts.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. Doan denies impropriety. As a major premise, she argues that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such. As a minor premise, she asserts that "actual observers" among the voters did not so view her acts and omissions because she was reelected to office in June of 1994. But, as explained, the "requirement" that she claims to discern is nonexistent. Furthermore, the "actual observers" among the voters apparently had only limited knowledge of her improprieties.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the matter of the Williams loan.

b. *The Howard Loans*

Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous

and, although more detailed, substantially similar to those of the special masters.

Beginning in May of 1991, according to the Commission's findings, Doan and Koma Howard engaged in a series of transactions wherein Howard drew checks on a line of credit payable to Doan or to another on her behalf. The transactions involved an amount of at least $1,400 to make good checks Doan had drawn on her personal bank account, which had become depleted because of levies related to the failure of the trucking business. Doan had two daughters: Jayme was the older and Megan the younger. Later in 1991 and also in 1992 and 1993, Howard drew checks in the amount of $6,716 on her line of credit payable to the California State Polytechnic University for Jayme. On June 21, 1993, she drew a check in the amount of $400 on her line of credit payable to Jayme herself; Doan cashed the check at a market, applied $150 to her account there, and received the rest in cash. On one occasion, Doan charged an undisclosed amount to an account Howard had with a retail store, with the latter's permission, to buy Jayme and Megan a television set and videocassette recorder for Easter. She made payments to Howard's line of credit and to Howard's account with the retail store, and was current at the time of the evidentiary hearing in mid-1994. She did not disclose these loans in her statement of economic interests for 1991, 1992, or 1993. Her failure to do so was intentional. Inapplicable was the exception for retail installment or credit card transactions under $10,000 on an account maintained in the creditor's regular course of business: her debt was not to the holder of such an account, but to Howard. Also inapplicable was the exception for loans from certain close family members: although Doan testified at the evidentiary hearing that Howard was "like a sister," she was not a member of her family.

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts and omissions included the violation of an obligation imposed on her as a public official by statute, which (it appears) must be viewed as flagrant and deliberate in light of the fact that she had been publicly reproved for similar acts and omissions in 1989.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan does not, and cannot, challenge the facts.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. With the same argument

about the views of "actual observers" that she used as to the Williams loan, Doan denies impropriety. That argument was unpersuasive there. It is unpersuasive here as well.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the matter of the Howard loans.

c. *The Darlene Jones Loan*

Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous and, although more detailed, substantially similar to those of the special masters.

On August 11, 1992, it will be recalled, Darlene Jones lent Doan $4,500, interest free, to be repaid within a year. The transaction and its circumstances are described above (see, *ante*, at pp. 320-321), and need not be repeated here. Doan did not disclose the loan in her statement of economic interests for 1992 or 1993. Her failure to do so was intentional. There was insufficient evidence to establish with certainty the dates or amounts of the various small loans that were alleged in the amended notice of formal proceedings. .

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts and omissions included the violation of an obligation imposed on her as a public official by statute, which (it appears) must be viewed as flagrant and deliberate in light of the fact that she had been publicly reproved for similar acts and omissions in 1989.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan does not, and cannot, challenge the facts.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. With the same argument about the views of "actual observers" that she used as to the Williams and Howard loans, Doan denies impropriety. That argument was unpersuasive there. It is unpersuasive here as well.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the matter of the Darlene Jones loan.

### 3. *Count Three*

As pertinent here, count three has two parts, concerning Doan's financial dealings and business relationships with Helen Cabell and Lieutenant Russell Williams, in the form of loans she had obtained.

#### a. *The Cabell Loan*

■ Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous and, although more detailed, substantially similar to those of the special masters.

In 1993, according to the Commission's findings, Helen Cabell was a clerk assigned to the Municipal Court for the Kings Judicial District of Kings County, Corcoran Division, and served Doan from time to time in the courtroom. She had held the same position in the Justice Court for the Corcoran Judicial District of Kings County for several years prior to the 1992 consolidation, and served Doan regularly in the courtroom. Before consolidation, she had come under Doan's administrative supervision. Afterwards, she did not; she nevertheless continued under her practical supervision. The two women frequently deposited their checks in the bank at the same time, with one of them doing the transactions for both. On August 10, 1993—even though she had known for several months that she was the subject of a preliminary investigation by the Commission—Doan asked Cabell for a loan for one or two days to cover her daughter Jayme's college expenses. The two women "exchanged" checks: Cabell drew a currently dated check for $740 payable to Jayme and Doan drew a postdated check in the same amount payable to Cabell; a day or two later, Cabell cashed Doan's check. The two women were lifelong friends, who, at the time of the evidentiary hearing in mid-1994, continued to do banking for each other. Moreover, the loan here was, so to speak, "secured," of small amount, and with a short term. Nevertheless, Doan was on notice that she could not properly borrow money from Cabell: she had been privately admonished for doing so in 1990. Furthermore, despite the change in administrative supervision, Cabell remained under Doan's practical supervision.

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts and omissions included obtaining a loan from Cabell, a member of the court staff, in violation of canon 4D(1)(a) of the California Code of Judicial Conduct, which counsels judges not to engage in financial and business dealings that may reasonably be perceived as exploiting their judicial position.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan does not, and cannot, challenge the facts.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. Doan denies impropriety. As a major premise, she argues that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such. As a minor premise, she asserts that the sole "actual observer," Cabell, did not so view her acts and omissions. Whether the latter is supported as a matter of fact is of no consequence. That is because the former, as explained, is unsound as a matter of law.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the matter of the Cabell loan.

b. *The Williams Loan*

Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous and, although more detailed, substantially similar to those of the special masters.

On April 23, 1991, it will be recalled, Lieutenant Russell Williams lent Doan $3,000, interest free, to be repaid within six months. The transaction and its circumstances are described above (see, *ante*, at pp. 327-328), and need not be repeated here.

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts and omissions included obtaining a loan from Lieutenant Williams, who routinely presented her with complaints and warrant applications, in violation of canon 4D(1)(b) of the California Code of Judicial Conduct, which counsels judges not to engage in financial and business dealings that involve them in frequent transactions or continuing business relationships with persons likely to come before their court.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan challenges the facts. She asserts in substance that Lieutenant Williams made the loan to the trucking business and not to her personally. At the evidentiary hearing, the witnesses included Williams

and Doan herself. The testimony of Doan was favorable to her position. That of Williams was not. The special masters, who saw the witnesses and heard their words, believed Williams and disbelieved Doan. After reviewing the record, the Commission did so as well. So now do we.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. With the same argument about the views of the sole "actual observer" that she used as to the Cabell loan, Doan denies impropriety. That argument was unpersuasive there. It is unpersuasive here as well.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice in the matter of the Williams loan.

### 4. *Count Four*

Count four concerns Doan's failure to list all creditors in her bankruptcy petition.

The Commission's findings of fact are set out in material part and with minor modifications below. They are unanimous and, although more detailed, substantially similar to those of the special masters.

On June 29, 1993, according to the Commission's findings, Doan and her husband filed a voluntary petition of bankruptcy. They were required to list all creditors. In supporting declarations executed under penalty of perjury, she stated in substance that they had done so. Nevertheless, and with knowledge and intent, she omitted as creditors Fabrie Jewelers, Lieutenant Russell Williams, Hugh Osburn, Morris Proctor, Darlene Jones, Koma Howard, and Daisy Smith. Prior to filing the petition, she and her husband had retained Franklin Samples, an attorney who held himself out as an expert in bankruptcy and had practiced in that area since 1957. He advised her that she was not required to list all creditors, such as those to whom she owed small amounts of money for household goods and services. She informed him of her debt to Williams, but not of any of the others. She told Fabrie Jewelers, Williams, and Darlene that she would omit, or had omitted, them because she wanted to make repayment in full.

The Commission's conclusions of law are set out in material part and with minor modifications below. They are unanimous. But unlike their findings of fact, they differ from those of the special masters, as noted.

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts

and omissions included the filing of her bankruptcy petition with its incomplete list of creditors. She could not reasonably have relied on the advice of Attorney Samples that she was not required to list all creditors because (it appears) she did not inform him of any of the debts in question other than that to Lieutenant Williams. Those other debts were not for small amounts of money for household goods and services, but for relatively large sums and/or for business expenses. By contrast, according to the conclusion of the special masters, she did not subject herself to discipline: she relied on Samples's advice, which although of questionable soundness was nevertheless given by a purported expert.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. In substance, Doan challenges what she takes to be the characterization of her intent as fraudulent. No such label, however, is attached. But we do note that, in the declarations supporting her bankruptcy petition, which were executed under penalty of perjury, she stated in substance that she and her husband had listed all creditors—when, with knowledge and intent, she had omitted those identified above.

We also believe that the Commission's conclusions as stated above are substantially sound, and we would adopt them as our own. Doan denies impropriety. But her major premise—that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such—is unsound as a matter of law. We decline Doan's request to "find that her conduct . . . *enhances* the esteem for the judicial office . . . ." (Italics added.) She implies that the only way for her to "tak[e] responsibility" for the debts in question was to fail to list creditors in her bankruptcy petition. That is not the case. She need only have reaffirmed.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice by failing to list all creditors in her bankruptcy petition.

### 5. *Count Five*

 Count five concerns Doan's habitual tardiness in commencing court sessions.

Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous

and, although more detailed, substantially similar to those of the special masters.

On July 1, 1992—the Commission's findings begin by way of introduction—the Justice Court for the Corcoran Judicial District of Kings County was consolidated into the Municipal Court for the Kings Judicial District of Kings County as the Corcoran Division. That court had three judges: Judge John G. O'Rourke in the Hanford Division, Judge Ronald J. Maciel in the Lemoore Division, and Doan in the Corcoran Division. Judge Maciel had been the presiding judge since consolidation. The Hanford Division had two departments: Judge O'Rourke sat in one; Judge Maciel and Doan sat alternately in the other, as well as in their own divisions.

In 1992 and 1993, the Commission's findings continue, Doan was habitually tardy in commencing court sessions by an hour to an hour and a half. On some occasions, she arrived at the courthouse late. On others, she arrived on time but attended to separate matters. On yet others, because she preferred to take the bench only once each session, she simply declined to do so until all parties in all actions were ready to proceed. She inconvenienced attorneys. She did the same to parties and witnesses, including law enforcement personnel who had been called away from their normal duties, and led them to express impatience and anger. She was the subject of complaints presented to Judge Maciel, Judge O'Rourke, the county court executive officer, and the county administrative officer, and received advisements from all four. She almost always completed her calendar before the close of day. But by making a late start, she caused court staff to make mistakes in their attempt to keep pace as she rapidly disposed of the matters at hand. Beginning in mid-1993, she became less tardy, but only somewhat.

In acting and failing to act as she did, concluded the Commission, Doan persistently failed to perform her duties in a diligent fashion. Her cited acts and omissions included her habitual tardiness in commencing court sessions, despite complaints and advisements, in violation of canon 3B(8) of the California Code of Judicial Conduct, which counsels judges to dispose of all judicial matters fairly, promptly, and efficiently, and advises them in its commentary to be punctual in attending court.

Having independently reviewed the record in its entirety, we believe that, with one exception, the Commission's findings as stated above are essentially correct, and we adopt them as our own. The exception is this: it has not been proved by clear and convincing evidence that, by making a late start,

Doan caused court staff to make mistakes. But for this point, Doan does not, and cannot, challenge the facts.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. Doan denies impropriety. Her argument, however, misses its mark. It is not directed against persistent nonperformance of duties, with which we are here concerned. Instead, it focuses on conduct prejudicial to the administration of justice, with which we are not. In any event, it falls of its own weight. Its major premise—that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such—is unsound as a matter of law. Its minor premise—that "actual observers" among the voters did not so view her acts and omissions because she was reelected to office in June of 1994—is dubious. "Actual observers" among the voters apparently had only limited knowledge of her improprieties. By contrast, "actual observers" among the parties, witnesses, and attorneys who came into the courtroom had fuller knowledge. And, to judge from their complaints, less favorable views.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have persistently failed to perform her duties in a diligent fashion by her habitual tardiness in commencing court sessions.

### 6. *Count Six*

■■■ Count six concerns Doan's offer to provide legal services on behalf of Darlene Jones's husband Rodney, who had been convicted of, and imprisoned for, federal felony narcotics trafficking offenses.

Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous and, although more detailed, substantially similar to those of the special masters, except as noted.

On August 11, 1992, it will be recalled, Darlene Jones lent Doan $4,500, interest free, to be repaid within a year. The transaction and its circumstances are described above (see, *ante*, at pp. 320-321), and need not be repeated here. Suffice it to say that Doan offered to conduct legal research for Darlene's husband. The Commission determined that it was not proved by clear and convincing evidence that she did not follow through. The special masters determined that it was.

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts

and omissions included her offer to conduct legal research for Darlene's husband.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and we adopt them as our own. Doan makes the same challenge to the facts that she made previously. At the evidentiary hearing, the witnesses included Darlene, Koma Howard, and Doan herself. The testimony of Doan was favorable to her position. That of Darlene and Howard was not. Against the Commission and, more notably, the special masters, Doan asks us to generally believe her and disbelieve the others. We will not.

We also believe that the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. Doan's argument to the contrary is similar to others she has used. Its major premise—that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such—is unsound as a matter of law. Its minor premise—that Darlene and Howard, the primary "actual observers," could not have so viewed her acts and omissions because of what she deems to be their bad character—need not be considered.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed conduct prejudicial to the administration of justice by offering to provide legal services on behalf of Darlene's husband.

### 7. *Count Seven*

 Count seven concerns Doan's request to Darlene Jones and Koma Howard, during the course of the Commission's preliminary investigation, not to give their cooperation to its agents.

Set out in material part and with minor modifications below are the Commission's findings of fact and conclusions of law, which are unanimous and substantially similar to those of the special masters.

During the course of the Commission's preliminary investigation, according to the Commission's findings, Doan told Darlene and Howard she did not want them to discuss the loans she had obtained from them with the Commission's agents.

In acting and failing to act as she did, concluded the Commission, Doan engaged in conduct prejudicial to the administration of justice. Her cited acts

and omissions included a refusal to cooperate with, or give reasonable assistance and information to, the Commission's agents in the course of the preliminary investigation, in violation of Government Code section 68725, which provides that a judge, among others, must do so.

Having independently reviewed the record in its entirety, we believe that the Commission's findings as stated above are essentially correct, and adopt them as our own. Doan again makes the same challenge to the facts that she made previously. At the evidentiary hearing, the witnesses included Darlene, Howard, and Doan herself. The testimony of Doan was favorable to her position. That of Darlene and Howard was not. Against the Commission and, more notably, the special masters, Doan asks us to generally believe her and disbelieve the others. We will not.

We also believe that, with one exception, the Commission's conclusions as stated above are substantially sound, and we adopt them as our own. The exception is this: by telling Darlene and Howard she did not want them to discuss the loans she had obtained from them with the Commission's agents, Doan committed wilful misconduct and did not merely engage in conduct prejudicial to the administration of justice. (Cf. *Adams* v. *Commission on Judicial Performance*, *supra*, 10 Cal.4th at pp. 908-911 [concluding that, by making material misrepresentations and omissions during the course of a preliminary investigation by the Commission, a judge committed wilful misconduct].) Doan denies impropriety. Her argument, however, misses its mark. It is not directed against wilful misconduct, with which we are here concerned. Instead, it focuses on conduct prejudicial to the administration of justice, with which we are not. In any event, it falls of its own weight. We simply modify words spoken above. The major premise—that conduct prejudicial to the administration of justice requires that the "actual observers" must view the conduct in question to be such—is unsound as a matter of law. The minor premise—that Darlene and Howard, the primary "actual observers," could not have so viewed her acts and omissions, apparently because they were or became "undercover" agents for the Commission—need not be considered.

Accordingly, we are of the opinion that Doan has been proved by clear and convincing evidence to have committed wilful misconduct by requesting Darlene and Howard, during the course of the Commission's preliminary investigation, not to give their cooperation to its agents.

C. *Discipline*

In deciding whether to impose discipline under former subdivision (c) of section 18 of article VI of the California Constitution and, if so, what

form such discipline should take, we seek as our ultimate objective to protect the public and the judicial system itself from judges who are unfit to hold office, determining what sanction, if any, is necessary to achieve this goal.

After independent consideration, we are of the opinion that, in accordance with the Commission's recommendation, we should indeed remove Doan from office for wilful misconduct, conduct prejudicial to the administration of justice, and persistent nonperformance of duties. We believe that only that sanction will guarantee protection of the public and the judicial system.

In order to carry out the obligations of office, a judge must possess integrity and impartiality and conduct himself accordingly. Doan did not. She displayed moral turpitude, dishonesty, and corruption. Our findings of fact and conclusions of law establish the point beyond peradventure. They are set out at length above, and need not be repeated here. Merely recall Doan's involvement in the matters relating to Miguel Meneses, Darlene Jones's nephews Darren Powell and Kenneth Jones, and Darlene herself. Recall as well Doan's offer to provide legal services on behalf of Darlene's husband Rodney. These incidents reveal that, as a judge, Doan looked to, and pursued, her own personal interests. Indeed, in the Powell affair, she went so far as to put a thumb on the scales of justice, and did so that she might profit from its verge.

Doan again asserts challenges to our findings and again raises arguments against our conclusions. In the course of our discussion, we found these very challenges unsuccessful and these very arguments unpersuasive. We do so here as well. She invokes her reelection to office in June of 1994. The voters, however, apparently had only limited knowledge of her improprieties. Certainly, the formal proceedings against her remained confidential until after the election. In any event, it is our determination that is dispositive. And our determination is removal.

Of course, we would hesitate to remove a judge who showed himself ready, willing, and able to reform under a less severe sanction.

Doan, however, is not such a judge. Quite the opposite is true. To use the words of one of the examiners, she is apparently the "most disciplined judge in the State of California"—meaning, obviously, the most sanctioned.

Doan did not learn from her public reproval in 1989 for, inter alia, failure to make full disclosure in her annual statement of economic interests. She again failed to make full disclosure in 1991, 1992, and 1993, with regard to

one or more of the loans she had obtained from Lieutenant Russell Williams, Koma Howard, and Darlene Jones.

Neither did Doan learn from her private admonishment in 1990 for, inter alia, engaging in financial dealings that exploited her judicial position—specifically, by borrowing money from Helen Cabell, who served her regularly as a courtroom clerk. She again engaged in financial dealings that exploited her judicial position—again, specifically, by borrowing money from Cabell, who continued to serve her from time to time as a courtroom clerk—in 1993. She did so even though she had known for several months that she was the subject of a preliminary investigation by the Commission.

Lastly, Doan did not learn from her public reproval in 1990 for lending the prestige of her office to advance the private interest of others. She again lent the prestige of her office to advance the private interest of others, even though she had promised not to do so in connection with the 1990 public reproval, in the matters relating to Darlene's nephew Darren Powell in 1992, Meneses in 1993, and Darlene herself in 1993.

In sum, Doan has had three opportunities for reformation. She will have no more.

## IV. DISPOSITION

For the reasons stated above, we conclude that Judge Glenda Kraft Doan, a judge of the municipal court, should be removed from office.

It is so ordered.

Under former subdivision (d) of section 18 of article VI of the California Constitution, a judge whom we remove from office is suspended from the practice of law unless and until we order otherwise.

Doan moves for permission to resume the practice of law. We deny her request. She relies on *Geiler v. Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, and *Gonzalez v. Commission on Judicial Performance, supra,* 33 Cal.3d 359. There, we permitted a removed judge to resume practice. (*Geiler v. Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 287; *Gonzalez v. Commission on Judicial Performance, supra,* 33 Cal.3d at p. 378.) But we did so, at least in part, because we did not find moral turpitude, dishonesty, or corruption. (*Gonzalez v. Commission on Judicial Performance, supra,* 33 Cal.3d at p. 378; see *Geiler v. Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 287.) Here, by contrast, we do so find. It is true

that, in *Adams* v. *Commission on Judicial Performance, supra,* 10 Cal.4th 866, we permitted a removed judge to resume practice in spite of an at least implied finding of moral turpitude, dishonesty, or corruption. But, to our mind, the acts and omissions that underlay removal there were less significant than those here.

We hasten to add that our denial of Doan's motion is without prejudice to the making of a new motion with proof of her rehabilitation, present fitness to practice, and present learning and ability in the general law. (Cf. Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct, std. 1.4(c)(ii) [dealing with actual suspension from the practice of law for a period of two years or more].)

On November 6, 1995, the opinion was modified to read as printed above.