*CJP Supp. 21 Opinion
BONNER, Chairperson.
This disciplinary matter concerns Judge James Randal Ross (retired), formerly a judge of the Orange County Superior Court. The Commission on Judicial Performance (Commission) concludes that Judge Ross committed willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The Commission censures Judge Ross and bars him from receiving assignments, appointments, or references of work from any California state court.
PROCEDURAL HISTORY
Judge Ross served as a judge of the Orange County Superior Court from 1983 to 1995. The events which are the subject of this matter took place *CJP Supp. 22 during the 1992 to 1995 time period, while Judge Ross was serving as a full-time superior court judge. Judge Ross retired on July 7, 1995.
This matter was commenced on December 11, 1996, with the issuance of a notice of formal proceedings. The notice was amended on June 2, 1997. Judge Ross filed answers to both notices and denied any misconduct.
At the Commission’s request, the Supreme Court appointed three special masters to conduct an evidentiary proceeding and to prepare a written report.[1] Eighty witnesses testified during the hearing that commenced on July 29, 1997, and concluded on August 8, 1997. Thereafter the masters prepared findings of fact and conclusions of law which were filed with the Commission on November 21, 1997.
On January 2, 1998, Judge Ross filed objections to the masters’ report, and after further briefing, the matter was set for oral argument before the Commission on March 12, 1998. Nine members of the Commission participated.[2]
FINDINGS AND CONCLUSIONS
The first amended notice of formal proceedings sets forth five counts of alleged misconduct. Counts one, four and five allege unjudicial conduct on the bench. Count two alleges use of the judicial office for personal gain, specifically promotion and sale of a book written by Judge Ross. Count three alleges sleeping during certain specified jury trials.[3]
The Commission has reviewed the record of proceedings before the special masters, and the arguments raised by the parties in their briefs before the Commission. The evidence of misconduct found by the masters is clear and convincing. For the reasons set forth hereafter, the Commission adopts the findings of fact contained in the special masters’ report as its own. Based on the masters’ findings, the Commission dismisses count three, and concludes that respondent engaged in willful misconduct or conduct prejudicial as to counts one, two, four and five.
*CJP Supp. 23 While the Commission adopts the masters’ detailed findings which are incorporated in this decision as an appendix, the facts are summarized here only as background for the Commission’s ruling on discipline.[4]
Count One (A)—Zapone v. Jaridly
Count one arises out of the conduct of a civil action entitled Zapone v. Jaridly, an automobile accident case in which State Farm had undertaken the defense of its insured. As trial preparation proceeded, State Farm became aware of facts creating a coverage issue. It withdrew its previous settlement offers. On December 1, 1993, State Farm, through its attorney Sherman Spitz, filed a declaratory judgment action in federal court.
The allegations of misconduct arise from four incidents.

The December 16, 1993 Incident—Conduct Prejudicial

On December 16, 1993, the parties in the underlying civil action appeared before Judge Ross for a mandatory settlement conference. Attorney Sherman Spitz, who represented State Farm in the declaratory judgment action, attended along with two claims people from State Farm.
Following the familiar settlement conference procedure of meeting with the parties (and their insurers) separately, Judge Ross met with defense counsel in chambers. Also included in this meeting were the State Farm representatives. Judge Ross was told of the coverage dispute, the declaratory judgment action, and advised that in view of the absence of coverage (based upon alleged fraud by the insured Jaridly), State Farm would make no settlement offer.
Judge Ross said he did not want to hear that an insurance company would not pay any money at a settlement conference, and that he was going to try all issues, including the declaratory relief issue, in his courtroom.
According to Spitz, Judge Ross said he was finding that Spitz and State Farm had acted in bad faith in connection with the settlement conference and he was going to order sanctions. He asked the State Farm representatives in chambers, “How much are you going to pay?” Spitz told them not to respond. Spitz explained that he did this because Judge Ross had already said he would award sanctions, there was no court reporter present in chambers, and his instruction was for the purpose of protecting his clients.
*CJP Supp. 24 Judge Ross testified that he turned to the State Farm representatives and said, “Well, how much money do we have today?” According to Judge Ross: “Out of the clear blue, over to the right rose this figure of Mr. Spitz and said ‘Nobody in this room will say one word on behalf of—because I am representing State Farm. I have it from the highest authority. This case is not worth a plugged nickel. We’re not paying a plugged nickel. Mandatory settlement conference over.’ ”
Any difference between Judge Ross’s version and the version recounted by Attorney Spitz is immaterial. Both accounts conclude that the conference was ended and the matter was taken up in open court, on the record. Either version sets the stage for what happened next. As set forth in the masters’ report:
“[Judge Ross] testified he told the parties he needed time to go to the bathroom and put his robe on. However, he did not go to the bathroom. Rather, he put on his robe and stepped into the hallway where he observed Spitz telling Ellis and Syverson that they better back Spitz up or else they wouldn’t be in State Farm any longer. Respondent testified he told Spitz that was improper and Spitz replied that respondent was a liar. Respondent testified Spitz further said: ‘Further, Judge Ross, you little bastard, if you fuck with me, I’ll see to it that you’re no longer a judge. And I’ve got State Farm’s billions behind me.’ ”
“Spitz denied he told the adjusters on the way to the courtroom to back him up if they still wanted to be with State Farm. He also denied that he and respondent had such a conversation in the hallway. Ellis testified there was no such discussion between herself and Spitz in the hallway after they all left chambers on December 16.”
“We are unpersuaded by respondent’s testimony of his perception of the hallway events. We find the statements attributed to Spitz in the hallway did not occur.”
Once in court and on the record, Judge Ross—with no motion or urging of any party—ordered that State Farm have Ed Rust, the president of State Farm, appear for a sanctions hearing. Rust was in the corporate office in Bloomington, Illinois. The masters found that Judge Ross was “extremely irate, caustic. . . . Yelling at Sherman Spitz, pointing his finger at him.”
The transcript of the hearing indicates that Spitz asked if he could be heard before the court made a ruling, but he was not allowed to do so. When Spitz asked Judge Ross what authority he relied on to order Rust into court, Judge Ross—who was upset and red in the face—replied, “Stick around counsel” in a sarcastic tone.
*CJP Supp. 25 According to the masters:
“Respondent admitted he was ‘furious’ and ‘angry’ and he tried to compose himself. We are not persuaded by respondent’s testimony that he wanted to call Ed Rust in to settle the case and to explain it to Rust in spite of the personal problems that would cause respondent.”
“We find that Spitz explained to respondent why he felt there was a question of coverage and that issue would be decided in the declaratory relief action. After he told respondent State Farm would not pay a ‘plugged nickel,’ respondent loudly asked the State Farm representatives how much they were going to pay, and Spitz told the State Farm representatives not to respond. Respondent was very angry; he told Cullins, Spitz and the State Farm representatives they could have personal exposure, they could be tried for conspiracy, Spitz and State Farm had acted in bad faith in connection with the settlement conference, he was going to order sanctions, and he would hold a sanctions hearing right then. Respondent also said he was going to try all issues, including the declaratory relief issue in his courtroom.
“In some circumstances it may be appropriate to order in the head of an organization to settle a case, but here the order was only made for the improper purpose of punishing State Farm and Spitz. State Farm did not make a frivolous argument regarding coverage, and it was inappropriate for respondent to tell the parties they could have personal exposure, that they could be tried for conspiracy, to tell them he was going to award sanctions and to tell them he was going to hold a contempt hearing. Respondent had no authority to try the declaratory relief action which had been filed in federal court. Respondent was angry, discourteous and impatient with the State Farm attorneys and witnesses. It was also discourteous to tell Spitz he could make his argument to the Court of Appeal and they would laugh at him.”
The masters concluded regarding the first incident alleged in count one (A): “We find that respondent committed conduct prejudicial to the administration of justice when he became angiy with Spitz and State Farm, lost his ability to be objective and ordered Ed Rust to appear on December 16, 1993.” We agree with the masters’ findings and conclude that Judge Ross engaged in conduct prejudicial to the administration of justice.

The December 29, 1993 Incident—Willful Misconduct

On or about December 9, 1993, Spitz filed a motion to stay the Zapone v. Jaridly matter pending the outcome of the declaratory relief action in federal court. Judge Ross heard the motion on December 29, 1993. The entire incident is set forth on two pages of transcript and, except for the statement of appearances by counsel, is set forth here in its entirety:
*CJP Supp. 26 “Judge Ross: Mr. Spitz, what right do you have to come into this court and make a special appearance for State Farm making a motion on behalf of State Farm when State Farm is not a party to the action?
“Spitz: Well, your honor, we believe that we’re a stakeholder in the action from the standpoint that my client—
“Judge Ross: Can you give me a case where when you’re a stakeholder you can come in and take over a courtroom?
“Spitz: May I explain, your honor?
“Judge Ross: No, you cannot, sir.
“Spitz: I don’t believe that I am trying to take over.
“Judge Ross: Deputy Martini.
“Bailiff: Counsel.
“Judge Ross: You will follow my directions that I am now going to give.
“Bailiff: Yes, your honor.
“Judge Ross: And that is Mr. Spitz has no right in this courtroom. He is not a party, he is not representing any party, and in addition thereto I am not here for—quoting him—for him to have fun, unquote. Therefore, if he says one more word even under his breath in this courtroom I will hold him in contempt of court and you will take him to the Orange County jail.
“Bailiff: Understood.
“Judge Ross: Understood, Mr. Martini?
“Bailiff: Understood.
“Judge Ross: All right. Let us proceed. Mr. Spitz, you will either leave or get out of the way.
“Bailiff: Sir, please wait in the hallway.
“Judge Ross: Unless you want to say one more word. Since this motion was made by a person or organization who is not a party to the action it has no validity and will not be heard by this court. That’s the end of it. *CJP Supp. 27 Gentlemen, I’m sorry that you had to come. I’m sorry that someone brought a motion when they had no right to bring a motion but I have no control over people filing papers unfortunately.”
The testimony before the masters was undisputed that when Judge Ross was making the above quoted remarks, he was yelling and upset. He was highly agitated. After Judge Ross had threatened Spitz with contempt if he said “one more word,” Spitz walked to the back of the courtroom and found a seat. Spitz felt his client had not been given a fair opportunity to be heard and he felt embarrassed for the system and for himself.
The courtroom was full because December 29th was law and motion day. The masters concluded: “We find by clear and convincing evidence that respondent abused his contempt authority. He had no proper justification for threatening Spitz with contempt for bringing a motion to stay. Respondent inappropriately used this hearing and his contempt powers to embarrass Spitz because he was angry with him.”
The masters found this constituted willful misconduct and conduct prejudicial. We agree with the masters’ findings and determine that Judge Ross committed willful misconduct.

The January 3, 1994 Incident—Willful Misconduct

On Monday, January 3, 1994, Judge Ross called the trial calendar and again took up Zapone v. Jaridly. This was the date that Judge Ross had set for Ed Rust, the president of State Farm, to appear regarding the issue of settlement.
Prior to the hearing, Spitz filed papers stating that Rust would not be appearing as ordered and setting forth the reasons for Rust’s nonappearance.
After taking appearances, and noting that now four lawyers were present on behalf of State Farm, Judge Ross purported to characterize what had happened in chambers on December 16th. He asked Spitz to “confirm” Judge Ross’s version and the following colloquy and events occurred:
“Spitz: No, not for those reasons. May I explain?
“Judge Ross: No, you can’t because you’re a liar because that’s what you told them and I’ll go up against you any time and my reputation against yours because you told them—
“Spitz: That’s not what happened, your honor.”
*CJP Supp. 28 Judge Ross then, with no further discussion or notice, called State Farm representative Lynn Ellis to come forward, had her sworn by the clerk, and began to ask her questions. Spitz objected and Judge Ross responded, “You made your record, counsel. Miss Ellis, please take the stand. We’re going to straighten this out once and for all.” Judge Ross proceeded to examine the State Farm representative about the events in chambers on December 16th and about an alleged incident in the hallway between Judge Ross’s chambers and the courtroom.
Spitz objected on the ground that Judge Ross was being argumentative with and harassing the witness, and on the additional ground: “We have not been given notice of this particular hearing. I object to this whole proceeding going forward, your honor, with all due respect.” Judge Ross replied: “Take your writ. Right now I am talking and the next time I start talking you’re in contempt of court when you interrupt this court. You can do anything else you want, but you’re not going to interrupt this proceeding.” Spitz testified he thought he would go to jail if he persisted. Spitz testified that Judge Ross was very accusatory, bellicose and sarcastic.
Judge Ross next called a second State Farm representative to the stand, had him sworn, and questioned him about the events in chambers on December 16th. He then dismissed the witness.
At one point Spitz asked to be heard and to make a record. Judge Ross said: “No, you can’t counsel. We already determined that that’s the decision of the court. . . . No. There will be no record by you, Mr. Spitz.”
Judge Ross then asked the third State Farm representative to come forward. Judge Ross asked her, “What is your authority from State Farm, your limits?” She replied she had policy limits authority (of up to $100,000). Judge Ross said that the ramifications of the case made it a multiminion dollar case, and that it would even rival a $60 million judgment against Farmers.[5] Spitz again asked if he could make a record and Judge Ross stated: “No, you can’t, counsel. All you do is talk and talk and talk and backwards and forwards. I’m going to make the orders. If you don’t like it, fine. You’re not to go any further. You’ve defrauded this court continually, lied to it, and I’m not going to take any more.”
*CJP Supp. 29 Judge Ross thereupon found willful disobeyance of the court order requiring Rust to appear. He sanctioned Spitz and his firm $5,000, defense counsel (hired by State Farm) and his firm $5,000, and State Farm $5,000. State Farm’s defense counsel asked to be heard, but Judge Ross would not allow him to speak.
Judge Ross again ordered Rust to be present on January 12, 1994.
Spitz again asked for an opportunity to make a record and Judge Ross again denied that request. Neither Spitz nor State Farm were afforded an opportunity to respond to Judge Ross’s assertions of fact, or any sort of hearing, before sanctions were imposed.
Regarding this incident, the masters concluded: “We find by clear and convincing evidence that respondent had an improper purpose in calling Ellis and Syverson to the witness stand. Respondent was primarily interested in proving that he was right and Spitz was wrong regarding Spitz’s order to the State Farm representatives not to speak. Respondent violated the due process rights of the witnesses and State Farm because he gave no notice he would examine these witnesses, he did not allow cross-examination of the witnesses and he did not allow State Farm to put on contrary evidence. Again, he misused his contempt powers when he threatened to hold Spitz in contempt for objecting to this ‘star chamber’ proceeding.”
The masters found this conduct to constitute both willful misconduct and conduct prejudicial. We agree and conclude that Judge Ross’s conduct constituted willful misconduct and conduct prejudicial.

The January 26, 1994 Incident—Conduct Prejudicial

Following the events of January 3, State Farm agreed to a settlement. When questions about the settlement arose, another hearing was held on January 26, 1994.
Judge Ross stated his understanding that the settlement would be for $100,000, and not $85,000. Judge Ross said: “If that’s untrue let’s get Mr. Rust out here. . . . Since he’s in town let’s get him here tomorrow or Friday. . . . Maybe my information is incorrect. If he’s not here and he is still in Bloomington he can come out and make a big show and I’m [szc] put it over until Friday. Which do you want, counsel, unless this matter is resolved or do you want to come back and make him come back from Bloomington next week? I don’t really care.”
*CJP Supp. 30 The attorneys eventually confirmed the amount was $85,000 total, with $60,000 from State Farm. After hearing this report, Judge Ross stated: “Well, then fine. I’m wrong and they are right. Okay. Fine. Then a $60,000 settlement.”
The masters stated: “We find that respondent again had an improper purpose. There was a dispute over $15,000 which was easily resolved by communicating with lawyers who had negotiated the settlement. Respondent knew or should have known that it was not necessary to have Rust appear to settle the dispute. Respondent knew local adjusters had authority up to $100,000 to settle a case. Respondent was threatening to order Rust to appear merely because of his anger with State Farm. [1D . . . [][]
“We conclude this was prejudicial conduct because it was ‘prejudicial to public esteem for the judicial office.’ (Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1].)” The Commission agrees. Judge Ross was embroiled in the cases and his threat as to State Farm was punitive.
Count One (B)—Harris v. Chevron
Judge Ross was charged with unjudicial conduct for throwing an object in court and yelling at an attorney in the case of Harris v. Chevron.
There is no factual dispute that Judge Ross slammed a tablet down on the bench and excused the jury. The gesture was dramatic and caused pencils to go flying. The purported justification, according to Judge Ross, was that Attorney DeGomez had repeatedly violated one of his in limine rulings.
Judge Ross stated that he tells attorneys that his practice as regards in limine rulings is that “if you violate my rule in limine the first time, I’ll be nice. The second time I will not be nice. And the third time I’ll do everything that I can to embarrass you.”
The masters summarized the evidence:
“We find by clear and convincing evidence that, in the presence of the jury, respondent became angry at Mr. DeGomez during cross examination when Mr. DeGomez was questioning in areas in violation of in limine rulings. Respondent slammed a legal pad onto the bench, causing pencils to go flying. Respondent then dismissed the jury and yelled at Mr. DeGomez for several minutes loudly enough to be heard in the hallway through a closed door.
*CJP Supp. 31 “Even if Mr. DeGomez violated an in limine motion, respondent’s response was unjudicial and constitutes prejudicial conduct. (See McCartney v. Commission on Judicial Qualifications (1974) 12 Cal.3d 512, 538 [116 Cal.Rptr. 260, 526 P.2d 268].) Respondent’s stated purpose of embarrassing the attorney was improper. Additionally, respondent was not patient, dignified and courteous, in violation of Canon 3B(4). We find this constitutes prejudicial conduct.” The Commission agrees.

Count Two

Judge Ross was charged with violating California Code of Judicial Ethics canon 2B(2) by lending the prestige of the judicial office to promote and sell a book.
Judge Ross is the author of a book entitled I, Jesse James. From approximately 1989 through his retirement in 1995, he kept the book available for sale in the courthouse. In one case, a juror testified that a copy of Judge Ross’s book was provided by the bailiff and passed among the jurors either in the jury box or the hallway.
Transcripts in one trial show that Judge Ross discussed the book with jurors in open court and told them it was for sale in chambers, and that he would autograph it. Other jurors testified that Judge Ross discussed the book from the bench. Some bought copies in chambers after the trial.
During the Walker trial in 1995, Judge Ross sold books to the attorneys participating in the trial. One juror—who also bought a book—testified that he was aware that one of the attorneys had purchased a book and believed that the attorney had done it to “suck up” to the judge.
The masters found:
“The evidence is clear and convincing that respondent sold copies of his book from his chambers and through his bailiff to jurors and attorneys. Most sales occurred after trials were over and took place in his chambers where respondent was available to autograph the book. Respondent did not explicitly advertise the book but did mention it in court in response to inquiries about it. Respondent established a procedure whereby copies of the book could be purchased through the bailiff who took the order and recorded it on order forms found at the bailiff’s desk in court. The book had received widespread national and local media attention. [][]... [f]
“Respondent has committed conduct prejudicial to the public’s esteem for the judiciary by selling the books from his chambers. There is no evidence of *CJP Supp. 32 pressure being exerted by respondent to buy his book. However, by informing attorneys and jurors from the bench or through his bailiff that the book was for sale after the trial in his chambers or from his bailiff and that he was available to autograph it, respondent was lending the prestige of his judicial office for personal pecuniary gain. Granted, the profits were minimal since it appears that less than 100 books were sold at $2.95 profit per book. However, it still constitutes prejudicial conduct in violation of the judicial integrity provisions of Canons 1 and 2A and the prohibition against using the judicial office to advance personal interests in Canon 2B.
“Also, the procedure established by respondent to sell his books from the courthouse was an inappropriate use of public judicial resources. Using bailiffs to assist in the sales was also a misuse of public resources.
“ ‘A judge may not misuse the administrative resources available to the judge. To accomplish a judge’s varied administrative responsibilities ... a judge has individuals, equipment, and facilities at his or her command. ... A judge may not use these resources for personal financial gain. . . .’ (Shaman, Lubet and Alfmi, Judicial Conduct and Ethics (2d ed. 1995) § 6.13.)
“We find these separate violations of the Canons constitute one incident of prejudicial conduct.” The Commission concurs.

Count Four

Judge Ross was charged with unjudicial conduct for telling an inappropriate, undignified and offensive joke during the trial of Wellema v. Wall in 1994.
The Wall case was a civil action involving alleged sexual molestation. Plaintiffs’ attorney described the nature of the case: “The allegations involved my client from the time she was 12 years old, for several years being sexually abused by the defendant, including sodomy, use of alcohol, use of vodka enemas, use of pins penetrating her nipples and other foreign objects, involved the use of rubber clothing. To summarize, disgusting conduct over at least six years of time, as I recall.”
During the course of the trial, with the parties present, the jury absent, and with a medical witness on the stand, Judge Ross told the following joke: “Did you hear about the psychologist that had this man in for testing for the Rorschach—if I’m saying it right—test and he said what’s this one, and the man looks at him and says that’s a man and a woman having intercourse. So, he showed him the next one. He says that’s two women making love. He turned over the third one. What’s this? Oh, that’s a gang intercourse. And he *CJP Supp. 33 turned over another one. Oh, they are having sodomy, a man and a woman. About that time the doctor said man, I think you’re a pervert, and the man looked at him and said don’t talk about me, doctor, they are your pictures.” Up to 30 people were present in the courtroom, including the plaintiff, who testified that she was “stunned.”
The Masters found: “Respondent committed prejudicial conduct by telling an inappropriate and offensive joke while on the bench in violation of the judicial integrity provision of Canons 1 and 2A and the provisions of dignity and courtesy of Canon 3B(4). This is especially the case in light of the sensitive subject matter of the case. Respondent was clearly demeaning to the public esteem for the judiciary by his thoughtlessness. (See Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 544-545 [247 Cal.Rptr. 378, 754 P.2d 724].)” We agree.

Count Five

Judge Ross is charged in count five with misconduct by becoming embroiled and abusing judicial authority to advance his own personal interests, specifically that:
1. He obtained waivers of future complaints against respondent to the Commission and of the filing of potential civil suits.
2. He threatened retaliation if complaints were made to the Commission or if civil suits were filed against respondent.
3. He obtained an agreement to indemnify himself for costs incurred in Commission proceedings.
4. He made contempt proceedings conditional upon the agreement to waivers and indemnification.
David and Janie Walker v. Daniel Craig, Hi-Standard Automotive was an action for personal injury arising out of an automobile accident. Plaintiff was Janie Walker, a reserve Costa Mesa police officer, whose police car was rear-ended by an allegedly drunk driver. Her husband, David Walker, was a sergeant in the Costa Mesa Police Department. There were two defendants, one the driver of the car that rear-ended Officer Walker and the other a products liability defendant.
The trial was protracted, and while Judge Ross’s arguments all focus upon the alleged misconduct of counsel trying the case, our focus is upon Judge Ross’s conduct, and whether he stayed within the bounds of judicial ethics. *CJP Supp. 34 As explained below, Judge Ross committed serious misconduct by coercing litigants and their counsel under threat of contempt to waive their legal rights, including their right to file a complaint with the Commission, and by compelling indemnification if a party filed such a complaint.
On June 12, 1995, after weeks of trial had already passed, Sergeant Walker was on the stand being examined by one of the counsel for the two defendants. Plaintiff’s counsel (Eisenberg) whispered words to defense counsel (Erickson) to which she took offense. According to the transcript, she said, “I don’t need that kind of language directed at me.”
Judge Ross admonished counsel that there would be no further conversation between counsel, or he would commence a contempt proceeding. He did not ask what had been said, but he made clear that he would not tolerate further interruptions due to exchanges between counsel. (That action is not challenged, and based upon a review of the transcript, it appears to be appropriate.)
The trial resumed. Sergeant Walker remained on the stand.
At the end of the day, Sergeant Walker complained to plaintiff’s counsel (Eisenberg) that Attorney Himes had extended his middle finger to him. This incident did not take place in Judge Ross’s presence, and he did not learn about it until the next day.
The next morning, which was June 13th, Judge Ross began with an apparent reference to the then ongoing investigation by the Commission. He indicated that he wanted to record what had transpired the preceding afternoon. He then ordered defense counsel (Erickson) “to tell me the exact words as best she can remember yesterday afternoon approximately 4:10 what Mr. Eisenberg whispered to you.” Erickson complied: “He’s an abrasive mother-fucker and I’m going to make the client pay.” The apparent reference was to defense counsel Himes—whom Eisenberg thought was being abrasive during his examination of Sergeant Walker.
Judge Ross found such language extremely offensive and thereupon entered the following order:
“I’ll tell you what I’m going to do. At this time I’m going to do the following. It will not affect the case and that’s why I’ve asked Mrs. Walker and Sergeant Walker to come up to the counsel table.
“However, if one word of the incident yesterday or this morning is ever reported back to me and it gets back I will release the transcript of yesterday *CJP Supp. 35 afternoon and this morning to the following: the Orange County Register, the Los Angeles Times, the Orange County Bar Association, the Orange County Trial Lawyers Association, the California Trial Lawyers Association, whatever their new name is, the State Bar of the State of California so that they may act accordingly.” After concluding his comments about the inappropriateness of such comments, including a reference to his concern that “I get reported to somebody like the Judicial Performance Commission,” Judge Ross called for the jury to be brought in.
At that time, prior to the jury returning, Attorney Eisenberg addressed the court and related the story of how Himes had given the finger to Sergeant Walker the afternoon before. Himes denied it; Sergeant Walker claimed it happened. Judge Ross directed that “there will be no more of that,” and the jury was eventually brought in.
The examination of Sergeant Walker resumed.
The remainder of the morning session continued without notable incident. Sergeant Walker’s examination was concluded. The defense rested. Plaintiff began rebuttal.
At the beginning of the afternoon session, however, Attorney Himes advised the court of a new incident. According to Himes, the bailiff had told him (Himes) that he (the bailiff) had overheard Sergeant Walker say that Walker hopes that Himes “lives in a metal house.” According to Himes, the bailiff “confronted” Walker about that statement. According to Himes, Walker responded, “After this is over that he’s done some investigation and has determined that I’m doing something illegal and he’s going to report me to the State Bar.”
The transcript does not contain any elaboration on the “metal house” reference, nor indicate whether Sergeant Walker was speaking quietly with an expectation of privacy, or even an indication as to whom the comment was addressed.
When Judge Ross inquired, the bailiff confirmed that Himes had correctly stated what the bailiff had overheard. Judge Ross characterized the alleged statement as being “atrocious” and “absolutely fantastic.”—“Police officers making such absolutely ridiculous statements in court where they can be overheard.”
Sergeant Walker, having been excused, was not in court.
Judge Ross then said, “If you want him brought in here we’ll have a contempt proceeding for contempt of court and I’ll put him in jail right now.”
*CJP Supp. 36 “THE COURT: If you want Mr. Walker brought back I’ll go get him. I mean I’ll send the marshal out to get him. If it needs to be in handcuffs I’ll do it.
“He was told—he was sitting here—on this kind of attitude.
“Do you want him brought back?
“MR. HIMES: Your honor, I would like to have honestly some admonition made if in fact—
“THE COURT: All right. When can Sergeant Walker be here?” He ordered plaintiff, Janie Walker, to telephone her husband and “get him here.” The trial resumed.
When Sergeant Walker arrived, Judge Ross called him forward and recited the allegation made by Himes,[6] which Judge Ross unequivocally characterized as contempt of court: “That is in my opinion contempt of court and you have the right to remain silent and have a full and complete hearing on it.” He told Sergeant Walker that a finding of contempt would result in financial sanctions and incarceration.
Himes restated that he was only seeking an admonition. Erickson suggested that perhaps counsel could resolve the matter by stipulation.
*CJP Supp. 37 Judge Ross stated that a contempt-related situation had caused him personal grief and financial losses because it resulted in a complaint to the Commission. Judge Ross then directed counsel to see if a stipulation could be reached to which all parties could fully agree.
Counsel presented a stipulation in which Sergeant Walker agreed not to make any complaint to the State Bar, and Himes agreed not to make any allegation of contempt against Sergeant Walker. Judge Ross rejected the stipulation unless the following language was included: “The parties and counsel also waive any claims against Judge Ross of a civil nature or before the Judicial Performance Commission.” That language was handwritten by Erickson at the bottom of the stipulation. No contempt hearing was held.
Thereafter, Judge Ross required plaintiff and Sergeant Walker to state on the record that they were not coerced into the waiver. In fact, the Walkers were coerced. Each believed that Sergeant Walker would suffer incarceration unless they agreed to Judge Ross’s requests.
The trial continued for another week. The final incident occurred on June 20, 1995 when Judge Ross cited Eisenberg for contempt during his closing argument. Again, all counsel worked out a stipulation to resolve the problem and reduce it to a writing. When it was submitted for approval, Judge Ross required the following language be added: “The parties and all counsel also waive any claims against Judge James Ross of a civil nature or before the Judicial Performance Commission.”
With respect to complaints that the court’s conduct was prejudicial to Walker and retaliatory, Judge Ross replied that if Eisenberg or his client were going to sue or report respondent to the Commission, he would proceed with a contempt hearing.[7]
Plaintiff was not in the courtroom. Judge Ross called Sergeant Walker forward and asked him to waive his and his wife’s right to file an action against Judge Ross.
Judge Ross stated there would be a contempt hearing if there was no waiver and, in response to Sergeant Walker’s request to consult with counsel, Judge Ross asked Eisenberg to speak with Mr. Walker. Eisenberg reminded the court that he did not represent Sergeant Walker. Judge Ross again stated there would be a contempt hearing without the waiver.
Sergeant Walker then gave his personal waiver to respondent. The masters found that this waiver was made under duress, and we concur.
*CJP Supp. 38 Judge Ross then demanded that Sergeant Walker make the same waiver on behalf of his wife. Walker gave the requested waiver on her behalf.
Judge Ross then required, in addition, a promise of indemnification: “Will you further indemnify James R. Ross for any action that she brings or anything to the Judicial Performance Commission which could cost me many thousands and thousands and thousands and thousands of dollars?” Sergeant Walker replied, “Yes, sir.” Walker did so because he believed that Judge Ross would send Eisenberg to jail and impose sanctions of $500,000. “I felt that the only way we were going to proceed with my case—my wife’s case, was to appease the judge again.”
The masters made the following findings and conclusions regarding count five:
Waivers
“Respondent requested and received waivers of any complaints to the Commission on Judicial Performance as well as waivers to the filing of any civil suits against respondent on June 13, 1995 and June 20, 1995. Each of these acts was unjudicial conduct. Canon 1 requires a judge to uphold the integrity and independence of the judiciary. Canon 2A requires that a judge shall act at all times in a manner that promotes public confidence. Respondent’s request and receipt of immunity from civil suit and disciplinary scrutiny for his conduct during the trial impugns the very foundation of judicial integrity. A judge must accept constant public examination freely and willingly. Respondent’s attempt to circumvent the public’s ability to have his conduct reviewed by the constitutional process which purpose is to provide the public with safeguards against judicial abuse undermines public confidence.
“Respondent’s request for the waivers was intentional. Respondent made the request and received waivers on two separate occasions. These acts were beyond the lawful power of a judge. Even if the requests for waivers of public scrutiny were lawful, they were specifically for a purpose other than the faithful discharge of judicial duties. Respondent on the record placed the value to him of such waivers at $50,000. Respondent requested and received the waivers for his own personal financial benefit.
“Respondent was on the bench conducting a jury trial when he made the request for and received the waivers. Further, the request and receipt of waivers required respondent to use his judicial powers for an improper purpose. Respondent was acting in his judicial capacity.
*CJP Supp. 39 “We find respondent committed two separate acts of willful misconduct, one on June 13, 1995, and one on June 20, 1995.” The Commission agrees.
Conditional Contempt
“Canon 1 requires a judge to uphold the integrity and independence of the judiciary. Canon 2A requires that a judge shall act at all times in a manner that promotes public confidence. Canon 3B(2) requires that a judge be faithful to the law regardless of fear of criticism. Respondent stated on each occasion that if he did not receive the waivers he requested, he would proceed with contempt hearings. Respondent took a recess for the purpose of research to make certain he conducted the contempt hearing against Dave Walker without committing error. Once respondent received the waivers, he did not conduct the contempt hearings even though respondent believed such hearings were appropriate. Respondent failed to address the acts he identified as contempt in a lawful manner. This breach of duty erodes public confidence in the judiciary as noted by several of respondent’s witnesses who were jurors during the trial; it questions the integrity of the judiciary; and, it certainly is not a faithful adherence to the law. Failure to proceed in a lawful contempt action in trade for a waiver of scrutiny of respondent’s ethical behavior is a violation of the most serious nature.
“Respondent’s request was intentional. The record is clear that if counsel and the Walkers did not agree to the requested waivers, a contempt hearing would be held. Respondent’s decision to conduct a contempt hearing as provided for by law under the facts known to respondent in each situation was well within his lawful power as a judge. However, respondent requested and received the waivers for his own personal financial benefit. This purpose was not for the faithful discharge of judicial duties and constitutes bad faith.
“Respondent was on the bench conducting a jury trial when he requested and received the waivers. Further, the request and receipt of waivers required respondent to use his judicial powers for an improper purpose. Respondent was acting in his judicial capacity.
“We find the respondent committed two separate acts of willful misconduct, one on June 13, 1995, and one on June 20, 1995.” The Commission agrees.
Indemnification
“On June 20, 1995, after respondent received the waivers he requested from counsel and Dave Walker, he further requested Dave Walker to indemnify respondent for any civil or judicial performance action Janie Walker *CJP Supp. 40 might bring against respondent. Dave Walker complied under duress. This request shakes the core of a fair and accessible court system. This is a classic chilling factor that impedes lawful inquiry into judicial performance. A judge making and receiving such indemnification violates Canon 1 requiring a judge to uphold the integrity and independence of the judiciary and Canon 2A which requires that a judge shall act at all times in a manner that promotes public confidence.
“The request for indemnification was directly made on respondent’s own initiative. It was intentional and beyond any possible lawful purpose.[8] Additionally, it was done for the purpose of respondent’s own personal financial benefit. This constitutes bad faith.
“Respondent was on the bench conducting a jury trial when he requested and received the waivers. Further, the request and receipt of waivers required respondent to use his judicial powers for an improper purpose. Respondent was acting in his judicial capacity.
“We find this constitutes a single act of willful misconduct.” The Commission agrees.
Dissuading the Filing of Complaints by Threats of Retaliation
“Canon 1 requires a judge to uphold the integrity and independence of the judiciary. Canon 2A requires that a judge shall act at all times in a manner that promotes public confidence. Canon 3B(2) requires that a judge be faithful to the law regardless of fear of criticism. Canon 3D requires a judge to take appropriate action when a lawyer exhibits unprofessional conduct in the presence of the judge.
“Respondent’s threat to send the transcript to various media and professional organizations violates multiple Canons. First, this is an unacceptable way to deal with perceived misconduct. Direct communication to the lawyer to correct the behavior or a referral to the appropriate disciplinary body is the proper course. Second, this approach demeans the integrity of the judiciary. Lastly, the public expects and deserves the judiciary to immediately address and correct the problem with the proper tools. This can only be viewed as respondent employing an inappropriate method of threatening counsel with public censure without due process of a disciplinary proceeding.
*CJP Supp. 41 “Respondent’s extraction of a waiver regarding the reporting of respondent’s activities to the Commission on Judicial Performance is inexcusable and impugns the very foundation of judicial integrity. Failure to proceed in a lawful contempt action in trade for a waiver of scrutiny of the respondent’s ethical behavior is willful misconduct.
“Respondent’s act was intentionally done after an evening had passed which afforded ample time for reflection regarding the appropriate course of action. Respondent’s announcement of his plan to contact the media and professional organizations in a retaliatory fashion was not a lawful approach to the problem of an attorney’s unprofessional conduct in a courtroom. Finally, even if lawful, this underlying purpose was not for a faithful discharge of judicial duties. The primary overriding purpose was for respondent’s own personal financial benefit. Respondent did not want to have this trial or his conduct reviewed by the Commission on Judicial Performance and was willing to discourage the filing of complaints by the use of a threat.
“Respondent was on the bench conducting a jury trial when he requested and received the waivers. Further, the request and receipt of waivers required respondent to use his judicial powers for an improper purpose. Respondent was acting in his judicial capacity.
“We find this constitutes a single act of willful misconduct.” Again, the Commission agrees.
JUDGE ROSS’S ARGUMENTS AND OBJECTIONS SUBMITTED FOR COMMISSION REVIEW
Judge Ross submitted written objections to the masters’ report. He argues that he did nothing wrong, and that if any discipline is imposed, it should be no more severe than a public admonishment.
Judge Ross’s factual objections do not identify any particular finding as being in error.[9] His briefs contain numerous statements of facts which either have no citation to the record, or, if cited, no support in the record. The Commission values the masters’ report and gives their findings great weight, especially respecting credibility determinations. Having carefully reviewed the record, the Commission concludes that the masters’ findings are fully supported by the evidentiary record.
It follows that the Commission finds no merit to Judge Ross’s assertions that do not square with the masters’ findings. In arguing that Judge Ross did *CJP Supp. 42 nothing wrong in the Walker case, for example, Judge Ross’s written objections assert: “There was no coercion; all parties testified on the record that they were signing the waivers of their own free will.”[10] Reference to the cited pages shows that each witness testified that in order to avoid jail or other threats from Judge Ross, they had signed waivers in order to keep Judge Ross from putting Sergeant Walker in jail.
The unqualified statement in Judge Ross’s brief that the parties testified they exercised their own free will is not accurate. We specifically find, as the masters did, that Janie Walker and her husband were coerced into signing the waivers, and that each believed that Sergeant Walker would suffer incarceration if they did not do so.
In another instance, Judge Ross’s brief asserts, without citation: “. . . Judge Ross’s intention was not to embarrass Spitz, but to keep order in his courtroom. Judge Ross had ruled that Spitz was not a party to the motion, and that he should stop addressing the court out of turn; when Spitz refused to follow the ruling the court had made, and continued to speak out of turn, Judge Ross told him he would hold him in contempt. This was not done to embarrass him, but to keep order in the courtroom. The calendar was full that day and court proceedings needed to continue in a timely fashion.” (Underscoring added.) The underlined portion is not a fair characterization of the record, which is quoted in the findings above. There was no evidence that Spitz refused to follow a court ruling, nor that he “continued to speak out of turn.” With respect to Judge Ross’s treatment of Spitz, the masters found— with no contradiction in the evidence from Judge Ross or from any other witness—that it was Judge Ross who was upset and yelling, not Spitz.
In short, the Commission finds no merit to Judge Ross’s assertions of error by the masters.
*CJP Supp. 43 With respect to Judge Ross’s legal arguments, they all share the same defect: they are not based upon the record. In each instance, Judge Ross starts with the premise that he did not do anything wrong, and concludes, therefore, that he was not acting in bad faith, and that he did not commit misconduct. Judge Ross’s arguments simply do not address the facts as found by the masters, and the Commission.
The record does reflect that Judge Ross may have encountered some difficult situations, and as the masters noted, Judge Ross “exercised great patience numerous times during the trial of Walker v. Craig.” All judges encounter difficult cases and difficult attorneys. No matter what the situation, however, there can be no justification for demands of waiver, conditioning contempt upon signing stipulations, or extorting promises purporting to preclude complaints to the Commission.
DISCIPLINE
Judge Ross served for 12 years as a judge of the Orange County court. He has no record of prior discipline. The masters—who observed Judge Ross and evaluated his credibility—found a lack of credibility. With respect to the incident involving Spitz in the hallway, for example, the masters found that the statements attributed to Spitz “did not occur.” Our own review of the record persuades us that Judge Ross’s description of certain events is not reliable.
On the other hand, Judge Ross called a large number of witnesses to testify that he has a good reputation as a judge. He practiced law for 29 years, and according to some witnesses, he was hard working and had other characteristics that one would expect a judge to have.
As the masters concluded, however, after recitation of the evidence in mitigation: “Respondent’s evidence of his honesty, legal knowledge, reputation for appropriate courtroom control and the difficult circumstances of various trials cannot mitigate the serious nature of the multiple acts of willful misconduct and prejudicial conduct he committed.” We agree. (See also Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239].)
By adopting the masters’ findings, the Commission has found eight instances of willful misconduct, plus five of conduct prejudicial. To the extent that multiple incidents of misconduct arose out of the same proceeding or occurrence, the Commission has considered this in assessing discipline. The Commission’s action is based upon the nature of this misconduct and its effect on the public and the judicial system, rather than a mere tally of the *CJP Supp. 44 number of instances of misconduct. (See Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1313, 1315 [240 Cal.Rptr. 859, 743 P.2d 919] [overlapping charges not counted separately for discipline].)
As noted, Judge Ross’s briefs and arguments continue to assert that his conduct was blameless. It is evident that Judge Ross has no basis for appraising his future conduct—and that events such as those described above could happen again if he were to sit as a judge.
We recognize that willful misconduct does not compel removal from office. Indeed, the Commission recognizes that a lesser sanction may be appropriate for a judge “who showed himself ready, willing, and able to reform under a less severe sanction.” (See Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 339 [45 Cal.Rptr.2d 254, 902 P.2d 272].) In this case, however, Judge Ross does not acknowledge any wrongdoing, nor is there any suggestion in the evidence or in the briefs that he would change his behavior if he were to resume judicial duties. In his brief filed January 15, 1998, Judge Ross continues to assert: “Respondent never committed any act of wilful misconduct, or prejudicial misconduct so sanctions should not be given.”
At oral argument, Judge Ross remained steadfast that he had done no wrong. With respect to extracting waivers from the parties of their constitutional rights to complain to the Commission, Judge Ross’s response remained that, “I made the best decision, I thought, for everybody.”
Thus, from what appears in the record, and what appeared at oral argument, there is no basis for the Commission to assume or conclude that Judge Ross is ready, willing and able to reform—under any sanction. (See Doan v. Commission on Judicial Performance, supra, 11 Cal.4th 294.)
As was the case in Kloepfer v. Commission on Judicial Performance-. “The record does not suggest that petitioner has, or will be able to, overcome this trait and that similar incidents will not recur. For this reason comparison of the discipline imposed in other cases, as petitioner suggests, is not fruitful. Our role is to determine, in the individual case, the action necessary to protect the public and the reputation of the judiciary. The evidence fully supports the conclusion of the Commission that this purpose requires that petitioner be removed from the bench.” (Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d at pp. 866-867.)
As the Supreme Court said in Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544]: “In making our independent determination of the appropriate disciplinary *CJP Supp. 45 sanction, we consider the purpose of a Commission disciplinary proceeding— which is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system. [Citations.]”
Judge Ross, having resigned from office, is not subject to removal. The next available option is an order of public censure plus an order barring Judge Ross from sitting on assignment. The Commission was granted such authority by Proposition 190.[11] Lesser sanctions, such as a public admonishment, would allow Judge Ross to sit again as a superior court judge on assignment.
Given the egregious misconduct presented in this case, the Commission orders that Judge Ross be publicly censured, and that he be barred from receiving any assignment, appointment, or reference of work from any California state court.
This decision shall constitute the order of public censure and bar.
Commission members Robert C. Bonner, Esq., Ms. Ophelia Basgal, Mr. Mike Farrell, Hon. Lois Haight, Hon. Daniel M. Hanlon, Patrick M. Kelly, Esq., Hon. Vincent J. McGraw, Ms. Harriet Salarno, and Donald E. Vinson, Ph.D., voted for the public censure and bar. There were two vacant positions on the Commission.

 The special masters were Justice Patti S. Kitching of the Court of Appeal, Second Appellate District, Division Three, Judge John E. Dearman of the San Francisco County Superior Court, and Judge Michael T. Garcia of the Sacramento County Superior Court.

 The Commission normally consists of 11 members. There were two vacancies on the Commission at the time of oral argument.

 The masters found a failure of proof as to the third count, and trial counsel have not filed objections. That count is therefore dismissed.

 In the event of a discrepancy between the masters’ findings and those made herein by the Commission, the Commission intends that these findings shall prevail.

 Plaintiff was not asking for $60 million or any seven-number figure. As events later developed, despite the rulings by Judge Ross against State Farm, the case settled for $85,000. The case settled because Judge Ross said he was going to strike the answer and enter default, Judge Ross said the case had a value of seven figures, and Judge Ross had imposed monetary sanctions. Given these things and respondent’s demeanor, State Farm’s trial attorney felt Judge Ross was prejudiced and would not provide a fair trial.

 The transcript reflects a lengthy dialog in which Judge Ross attempts to conduct a contempt proceeding. With respect to Sergeant Walker’s alleged contempt, the transcript shows:
“THE COURT: ... Sergeant Walker, I have a very serious charge against you. I am going to repeat it to see if the deputy, I’m saying it correct.
“That Yesterday at approximately 4:30 p.m. that is or 1630 in Marine and Army and Air Force time that you made the following statement, and would you repeat again what you said previously, the first part of the statement?
“THE BAILIFF: Sergeant Walker made a statement to me that Mr. Himes better live in a metal house at which time I confronted him said you don’t make those kind of remarks in my courtroom, and he stated he didn’t mean it in a threatening manner, he meant it similar to people who live in glass houses don’t throw rocks.
“Then he said he had information that Mr. Himes was involved in some illegal activity and he would report him to the State Bar at the end of the trial.
“THE COURT: All right. Sergeant Walker, you have the right to remain silent. This will be a hearing on a contempt proceeding.
“MR. EISENBERG: Ah.
“THE COURT: And I will set it because there is no question in this court’s mind that this is contempt of court. It is one of the most terrible things I’ve ever heard and you’re entitled to counsel so you can remain silent or you can say you want to talk now.
“I don’t care. But you have the right to remain silent. You also have the right to an attorney. If you cannot afford an attorney one will be appointed for you for the order to show cause hearing for contempt.”

 Judge Ross also said, “I assume—and if you sue me Mr. Eisenberg, I’ll get your ass for the rest of your life.”

 Additionally, article VI, section 18, subdivision (h) of the Constitution provides: “No civil action may be maintained against a person, or adverse employment action taken against a person, by an employer, public or private, based on statements presented by the person to the commission.”

 The Commission’s rules specify that: “Objections to the masters’ report and all factual statements shall be specific and shall be supported by reference to the book and page number of the record.” (Rules of Com. on Jud. Performance, rule 130(a).)

 At oral argument, Judge Ross’s counsel continued to assert that the extortion of waivers was not through the exercise of judicial authority:
“CHAIRMAN BONNER: Is it your position that the waivers that were given by the attorneys and the parties were freely and voluntarily given?
“MS. SUWCZINSKY: Absolutely.
“CHAIRMAN BONNER: You’re telling us that Judge Ross did not use his position of authority in any way to induce the parties and litigants to enter into these waivers?
“MS. SUWCZINSKY: No, he did not. He gave the litigants a choice: Either fill out the waiver, or let’s go forward with contempt proceedings and declare a mistrial.
“CHAIRMAN BONNER: But if you say, you know, ‘Either sign the waiver or we’re going to have contempt proceedings,’ as to you, counsel, isn’t that coercive?
“MS. SUWCZINSKY: No. Not if stated as—as the way Judge Ross stated, it was ‘We are going to have contempt proceedings. We are going to have this trial stopped. We are going to have a mistrial.’
“The only way that’s not going to happen is if everybody here agrees to just forget what’s been happening so far and start from a clean slate and waive everyone’s complaints against everyone else since everybody’s been doing so many egregious things in the courtroom.”

 “The commission may also bar a former judge who has been censured from receiving an assignment, appointment, or reference of work from any California state court.” (Cal. Const., art. VI, § 18, subd. (d).)